COMMONWEALTH *vs.* JOHN T. DIRRING
(and a companion case).

Bristol.   May 6, 1968. — June 21, 1968.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Practice, Criminal,* Guarding of defendant in court room; Examination of jurors; Attendance of witnesses; Judicial discretion; Suppression of evidence; Exceptions: renewal of exception; Striking of evidence. *Jury and Jurors. Arrest. Search and Seizure. Constitutional Law,* Search and seizure. *Evidence,* Illegally obtained material, Relevancy and materiality, Admissions and confessions. *Robbery. Words,* "May," "Shall."

At a jury trial of indictments for armed robbery against two defendants, there was in the circumstances no unreasonable exercise of discretion in the denial of motions for the removal from them of manacles, chains and leg irons before their entry into the court room, or reversible error in permitting a guard armed with a shotgun to be stationed in full view of the jury. [528]

Where the judge at the trial of an indictment for armed robbery asked the questions required by G. L. c. 234, § 28, of prospective jurors, there was no error in the denial of a motion to ask them whether they

---

[3] The petitioner also refers to the judge's charge. Nothing therein warrants postconviction relief.

Commonwealth *v.* Dirring.

had read about the case and what their attitude would be toward a defendant appearing in the court room in manacles. [528–529]

The right under G. L. c. 277, § 66, of an indicted defendant to process to summon witnesses necessary to his defence does not extend to witnesses outside Massachusetts, and this result is not altered as to witnesses in a reciprocating State by the uniform law to secure the attendance of witnesses, c. 233, §§ 13A–13D. [529]

There was no abuse of discretion in the denial of a motion presented by a defendant approximately ten months after arraignment on an indictment and on the fifth day of trial for process to summon as witnesses many persons from various States and penal institutions across the country whose testimony, according to the defendant's counsel, would be primarily hearsay. [529, 530]

Arrest of the defendant in an armed robbery case by a police officer after the robbery solely because the defendant was in the company of other persons whom the officer was arresting in connection with another crime was illegal [530–531]; and articles seized upon a search of the defendant's person incidental to his arrest, and further articles seized upon a consequent search of an apartment, were obtained in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States; and error in denying a motion by him to suppress such articles as evidence and in admitting them at his trial was prejudicial and entitled him to a new trial [531].

A defendant indicted for armed robbery had standing to move on constitutional grounds to suppress as evidence articles seized on a search of his person pursuant to an illegal arrest of him, and further articles seized upon a consequent search of an apartment, even though he denied owning the articles found on his person. [531–532]

A defendant indicted for armed robbery had no standing to move on constitutional grounds to suppress as evidence articles in which he had no proprietary interest seized in an apartment of another person when the defendant was not present and during a search under a warrant in connection with another crime, even though the articles were obtained as a result of an illegal arrest and search of a codefendant and seizure from him of objects leading to the search of the apartment. [532–533]

It was within the judge's discretion at the trial of indictments for the armed robbery of a bank to permit a witness to describe the location of some of the streets in its neighborhood [533]; and failure of the defendants to object at the trial to further testimony of the witness as to the presence of an automobile a short distance from the bank on two occasions prior to the crime precluded them from raising on appeal the question of the propriety of such further testimony [533–534].

At the trial of indictments for armed robbery of a bank, testimony by the owner of an automobile that it had been stolen on the day of the robbery was not irrelevant on the record. [534]

Evidence rightly admitted at the trial of indictments against two defendants for robbery of a bank while masked and armed warranted conviction of both defendants, although none of the employees in the bank during the robbery could identify the robbers. [534]

At the trial of indictments against two defendants, where a witness for the Commonwealth testified without objection that a participant in the crime other than the defendants, in the presence of only one of them, had stated "We did it," and the judge in his charge limited the statement to use only against the defendant in whose presence it had been spoken, and the defendants' objections to the charge did not remotely suggest to the judge that it failed to include an instruction that inculpatory statements must be made in furtherance of a conspiracy, there was no merit in an assignment of error based on such failure coupled with a remark by the judge earlier in the trial as to statements by one participant in a common enterprise being admissible against all the participants. [535–536]

Two INDICTMENTS found and returned on June 3, 1963.

The cases were tried in the Superior Court before *Smith, J.*

*Reuben Goodman* for the defendants.

*Peter B. Gay,* Assistant District Attorney, for the Commonwealth.

SPALDING, J. The defendants George R. Pinto and John T. Dirring were convicted under indictments charging each with armed robbery. The cases were tried pursuant to G. L. c. 278, §§ 33A–33G. Both appealed.

The evidence may be summarized as follows: On April 24, 1963, about five to ten minutes past 10 A.M. a robbery occurred at the Bristol County Trust Company in Taunton. Four bank employees were on the premises at the time. They testified that two men wearing masks entered the bank with guns drawn and proceeded to commit the robbery. None of the employees could identify the robbers. They were, however, able to describe their approximate height and weight and there was testimony that one of the robbers was larger than the other. One of the tellers also described the bag used by one of the robbers to collect money.

There was also testimony that the serial numbers of certain money were placed on a "decoy list" and that the money was set aside at the teller's window in order to facilitate tracing the proceeds in case of a robbery. One of the employees heard the larger robber remark to the smaller, "Did you look in here, John?" or "Did you watch them, John?"

The sister of the defendant Pinto, Audrey Pinto (now

Solomon), occupied an apartment in a housing project on DeWert Avenue in Taunton. Various neighbors of Audrey testified to the effect that about 8:10 A.M. on the day of the robbery George Pinto, John Dirring and one Joseph Gleason got out of a 1958 Buick with Rhode Island plates near the apartment.[1] They were seen again about 10:30 to 11 A.M. walking to the apartment with clothing over their arms. The shorter man, who was identified as the defendant Dirring, was carrying a shopping bag that "was real heavy" and matched the general description of the bag used during the robbery. About 12:30 P.M. someone was seen leaving the apartment carrying a box to an "aqua and white" Chevrolet. Dirring was seen carrying a pink cardboard box to the Rhode Island Buick. He drove away about 1:05 P.M. At 1:50 P.M. Pinto was seen leaving in a taxi.

Walter McGuire, a taxi driver, testified that he was called by Audrey Pinto to her apartment about 1:45 P.M. on the day of the robbery to pick up a passenger named Olson. He was met at the door by two men, Joseph Gleason and Richard Martin, who were holding guns. McGuire also recognized the defendant Pinto. Gleason offered McGuire $100 a man to take the three men to Boston. McGuire refused and Gleason offered him $100 to take Pinto to Brockton. Gleason threatened McGuire with shooting if he told anyone of the incident. Pinto told McGuire to carry a suitcase which he said was light because it was filled with money. McGuire asked the men if they had robbed the Bristol County Trust Company, and this was denied. The men left in separate cars and subsequently met at a rendezvous off Route 114 where Pinto took leave of McGuire, throwing a $50 bill in the window of the cab and commenting: "Don't forget. You haven't seen me for three months." McGuire told his story to the police. Shortly thereafter he was threatened by Pinto who said to him, "You'll be six feet under before this trial comes up."

---

[1] It was stipulated that Rhode Island registration number JD–721 was issued to John Dirring for a 1958 gray four door Buick sedan, and that this registration was in effect on April 24, 1963.

Audrey Pinto testified that Pinto, Dirring and Gleason came to her apartment at eight thirty on the morning of the robbery. They left the apartment and returned about 10:30 A.M. Audrey told them she had heard of the bank robbery and Gleason told her that they had done it. Audrey saw some money in the upstairs bedroom on the bed. She testified that the men left in a Chevrolet and in McGuire's cab and that she was told to call a particular attorney in Boston if the police inquired.

Officer Keough testified as to the arrest of Pinto in Boston about three days after the robbery. He had been following one Fagundes in connection with the robbery of a Boston bank. As Fagundes was entering his automobile in a parking lot he was arrested. Pinto and a woman, who were accompanying Fagundes, were also placed under arrest. Officer Keough did not know Pinto at the time of the arrest. Pinto was subsequently searched and a set of keys was taken from him. A paper containing a telephone number was also obtained from him which led the police to the apartment of one Claire Maslauskas at 106 Heath Street, Boston. A suitcase was found in the apartment which the police opened with one of the keys taken from Pinto. The suitcase contained $5,095. This money was subsequently turned over to Chief Bobola of the Taunton police department. Some of this money was later identified as having been taken from the bank. Additional evidence was also obtained at the apartment of one Geraldine McLeod in Brockton.

One Albert J. Martin testified that he knew Dirring; that he had dealings with a Tiny and Al's Diner in Providence in which Dirring appears to have been the owner; and that one of his employees had received three $1 bills as part of a payment for meat delivered at the diner. These bills had been taken from the bank.

The defendants Dirring and Pinto both testified. They denied that they had committed the robbery and sought to account for their whereabouts on the day of the crime.

1. The defendants urge that the court erred in denying their motions to remove manacles, chains and leg irons before they were taken into the court room in view of the jury. Assignment No. 3. They also complain that the security precautions were excessive because a guard with a shotgun was stationed in the court room in full view of the jury. Assignment No. 5. The court denied the motions because: "In the opinion of the Special Sheriff in charge of the prisoners, and in the opinion of the Court, after investigation, it is believed that the public safety and proper conduct of the trial require that the defendant Dirring be present in Court properly secured." A similar reason was given with respect to Pinto. In view of the information possessed and relied on by the judge taken together with the criminal records of the defendants, the court's discretion cannot be said to have been unreasonably exercised.[2] See *Commonwealth* v. *Agiasottelis*, 336 Mass. 12, 16; *Commonwealth* v. *Chase*, 350 Mass. 738, 740.

It is difficult to see why the presence of a guard armed with a shotgun was needed in the court room and the better course would have been to have forbidden it. But we are not prepared to say that this constituted reversible error. It had been brought to the judge's attention that a codefendant of Dirring and Pinto had escaped. The judge thus had some reason to believe that more than ordinary security precautions were required.

2. The defendant Dirring filed a motion setting out a list of sixteen questions designed to elicit, among other things, whether the jurors had read about the case and what their attitude would be toward a defendant appearing before them in manacles. This motion was denied. Assign-

[2] It appears that Dirring's resentment to the manacles and leg irons was such that he refused to enter the court room in that condition and was carried in bodily. This episode was of his own making and tended of course to focus attention on his restraints; it can hardly be charged to the Commonwealth. There was evidence that when Dirring was brought into the court room he stated, "What the hell kind of Court are you running here, keeping a man in chain and cuff?" In denying Dirring's motion the judge took into account the disturbance which Dirring had caused. He also could have taken into account that at the time of the trial Dirring was serving a sentence in a Federal penitentiary.

ment No. 2. The judge confined the questions to those prescribed by G. L. c. 234, § 28. It is settled by our decisions that the questioning of jurors other than as required by the statute rests wholly in the discretion of the judge. *Commonwealth* v. *Monahan*, 349 Mass. 139, 156. The denial of the motion reveals no error.

3. The defendant Dirring assigns as error the denial of his motion for compulsory process of witnesses. Assignment No. 1. This motion was presented on the fifth day of trial and requested some thirty-two persons to be summoned from various States and penal institutions across the country. The motion appears to have been made by the defendant personally in writing and was argued by his counsel. The court took note of the numerous names and locations and asked why the motion should be allowed at that late stage in the proceedings, and further asked counsel what information the requested witnesses would supply. Counsel replied that the testimony would be primarily hearsay.

Requested witness No. 4 was the proprietor of the "Columbus Wholesale House" in Providence, Rhode Island, who was to bring with him all records of sales to "Tiny and Al's Diner." The motion was properly denied in toto by the judge as a matter of discretion and violates no constitutional or statutory rights of the defendant. Although the defendant was entitled to compulsory process under G. L. c. 277, § 66, for all "witnesses who are necessary to his defence," this right does not automatically extend beyond the territory of the Commonwealth. The provisions of the uniform law to secure the attendance of witnesses from without a State in criminal proceedings, which is in effect in both Massachusetts and Rhode Island (see G. L. c. 233, §§ 13A–13D, inserted by St. 1937, c. 210, § 1, and G. L. [Rhode Island] [1956], c. 16, § 12–16–1 et seq.), does not alter this result.[3]

---

[3] Section 13B reads in part: "If a person in any state which by its laws has made provision for commanding persons within its borders to attend and testify in criminal proceedings pending, or grand jury investigations and proceedings commenced or about to commence, in this commonwealth is a material

The defendant would have us read the word "may" as "shall". This we decline to do. Some discretion must reside in the trial judge to prevent abuses. See *United States v. Zuideveld*, 316 F. 2d 873, 881 (7th Cir.). This is particularly so in a case where a defendant tardily presents nothing more than a list of names of persons residing in all parts of the United States, and requests their presence without any prima facie showing that their testimony is relevant or competent. See *Dirring v. United States*, 353 F. 2d 519, 520 (1st Cir.). It appears that Dirring was arraigned on the indictment on June 10, 1963; the trial commenced on April 6, 1964. Thus Dirring had approximately ten months in which to prepare for trial. In these circumstances the judge could very well have concluded that the motion was not made in good faith. It has all the indicia of an eleventh hour attempt to inveigle the judge into a ruling that might turn out to be error on appeal. The denial of the motion reveals no abuse of discretion.

4. Both Dirring and Pinto presented motions (both of which were denied) to suppress the evidence resulting from the arrest of Pinto on the ground that the arrest, an incidental search and the subsequent search of the Maslauskas apartment were invalid.[4] Assignments Nos. 6 and 8.

We shall deal first with Pinto's contention. The uncontradicted evidence put forward by the Commonwealth shows that Pinto was observed by a Boston police officer while in the company of one Fagundes and a woman. The

witness in a criminal proceeding pending in a court of record of this commonwealth . . . a justice or special justice of such court *may* issue a certificate under the seal of the court, stating such facts and specifying the number of days the witness will be required, which certificate may be presented in accordance with the laws of such other state to a magistrate or officer thereof for appropriate action to secure the attendance of such witness in this commonwealth" (emphasis supplied).

[4] Dirring's motion was heard several months prior to the trial by another judge, and was renewed at the trial prior to the taking of any evidence. Pinto's motion was made at the trial prior to the taking of any evidence. The evidence in support of both motions was not in dispute. Further objections to the purported illegally obtained evidence made when the evidence was offered need not be discussed. Where an exception is taken to the denial of a motion to suppress, the rights of a defendant are adequately saved and further exceptions are unnecessary. *Commonwealth v. Mitchell*, 350 Mass. 459, 464.

officer suspected Fagundes of having been involved in the robbery of a Boston bank. All three were placed under arrest. It thus appears that the sole basis for the arrest of Pinto was that he was in the company of Fagundes. At most it was an arrest founded on mere suspicion. That is not enough. *Commonwealth* v. *Lehan,* 347 Mass. 197. *Alegata* v. *Commonwealth,* 353 Mass. 287. As stated above, a search incidental to his arrest was made of Pinto and evidence was obtained which led to the search of the Maslauskas apartment. There a suitcase was found which was opened by a key taken from Pinto. The suitcase contained $5,095 in currency, some of which was identified as the proceeds of the robbery. Thus the search of the apartment was the product of the search of Pinto which in turn was incidental to an illegal arrest. This evidence was, therefore, obtained in violation of Pinto's constitutional rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, and the motion to suppress should have been granted. The evidence resulting from the search was prejudicial to Pinto and entitles him to a new trial. Despite the contention to the contrary by the Commonwealth we are of opinion that Pinto had standing to object. The Commonwealth's contention is based on the fact that when arrested, and subsequently at the trial, Pinto denied ownership of the keys and paper containing the telephone number found on his person. It is urged that since Pinto is not charged with a possessory crime he must have a property right in the evidence seized to challenge the search.

This argument cannot prevail in the light of the decision of the United States Supreme Court in *Jones* v. *United States,* 362 U. S. 257, 267. In that case, as explained in *Simmons* v. *United States,* 390 U. S. 377, 390, standing requirements were relaxed in two ways: "First . . . when . . . possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge the

admission of the evidence. Second . . . the defendant need have no possessory interest in the searched premises in order to have standing; it is sufficient that he be legitimately on those premises when the search occurs." Pinto has standing under the second test laid down in the *Jones* case. It would be incongruous to say that Pinto would have standing to suppress the objects seized had they been taken in his home or from premises where he legitimately happened to be present, but that he could not move to suppress the objects when they were seized from his person pursuant to an illegal arrest. We refuse to sanction such an incongruity. Under the rule in the *Jones* case Pinto was "a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Jones* v. *United States, supra,* at page 261. In these circumstances Pinto's denial of ownership did not deprive him of standing to challenge the search. See *United States ex rel. DeForte* v. *Mancusi, Warden,* 379 F. 2d 897, 903 (2d Cir.). See 1965 Wash. U. L. Q. 488, 495.

With respect to the defendant Dirring, we are of opinion that he lacks standing to challenge the introduction of the evidence obtained at the Maslauskas apartment. The police arrested and searched Pinto and not Dirring and in so doing "invaded no right of privacy of person or premises which would entitle . . . [Dirring] to object to its use at his trial." *Wong Sun* v. *United States,* 371 U. S. 471, 492. Dirring alleges no interest in the premises searched or the evidence uncovered. The search was not directed against him, and he was not on the premises where the search was made. See *Jones* v. *United States,* 362 U. S. 257, 261. In fact, the police were searching the premises under a warrant in connection with a Boston bank robbery. In answer to Dirring's contention that he has standing to object, the language of Judge Friendly in *United States* v. *Bozza,* 365 F. 2d 206, 223 (2d Cir.), is pertinent: "The values that the Fourth Amendment protects are sufficiently advanced by

excluding the results of illegal searches and seizures at the behest of 'victims' in the broad sense the Supreme Court has given that term; we see no important purpose to be served by holding that a thief who has left evidence of his crime on the premises of a confederate is subrogated to the latter's right to complain of a search and seizure." See *Steeber* v. *United States*, 198 F. 2d 615 (10th Cir.); *United States* v. *Serrano*, 317 F. 2d 356 (2d Cir.); *Diaz-Rosendo* v. *United States*, 357 F. 2d 124 (9th Cir.); *United States* v. *Grosso*, 358 F. 2d 154 (3d Cir.); *United States* v. *Granello*, 365 F. 2d 990 (2d Cir.); *United States* v. *Beigel*, 370 F. 2d 751, 756 (2d Cir.).

5. The defendants argue that it was error to admit the testimony of one Robert Devlin. Assignment No. 7. In the course of his testimony the witness described the location of some of the streets in the neighborhood of the bank. The defendants urge that the testimony was too remote. It could have aided the jury in understanding the physical arrangement of the area where the robbery occurred. As such it was within the judge's discretion to admit this evidence.

The witness also testified that he worked a short distance from the bank and that on two occasions (the times of which were not fixed) prior to April 24, 1963, he saw a gray Buick with Rhode Island license plates beginning with the letter "J" in the lot where he parked his car.[5] The defendants now seek to raise here a question which was not raised by them at the trial. It is asserted that the testimony improperly suggested to the jury that the defendants had been to the scene of the crime prior to the commission of the robbery and that they were, therefore, planning to rob the bank. In view of the cross-examination, it is highly improbable that the jury would have drawn such an inference. But the point is not now open, for the evidence concerning the presence of a Buick car with Rhode Island plates containing the letter "J" was never objected to by these defendants;

---

[5] It had already been shown that Dirring owned a car matching this description.

their objection was limited to the description of the streets.

6. There was no error in admitting the testimony of one Emond to the effect that his gold and white car was stolen on the day of the robbery. No objection was taken by the defendants to this testimony, although there was subsequently a motion to strike on the grounds that it was irrelevant. Such a motion was addressed to the discretion of the court. *Solomon* v. *Dabrowski,* 295 Mass. 358, 360. But the evidence was not irrelevant, because Audrey Pinto had testified previously that a similar car was parked in front of her apartment on the day of the robbery. The weight of this evidence was for the jury to determine.

Other matters mentioned in Assignment No. 7 have not been argued and are treated as waived.

7. The defendants' motions for directed verdicts were properly denied. Assignment No. 12. The evidence which has been recited in the early part of this opinion (which need not be restated) was sufficient to warrant the submission of the case to the jury against both defendants. And this is true as to the defendant Pinto if his case is considered apart from the evidence which we have held should have been suppressed.

8. Audrey Pinto, called by the Commonwealth, testified that her brother George Pinto, Gleason and John Dirring came to her apartment at about eight thirty on the morning of the robbery; that they subsequently left and returned about 10:30 A.M. She testified that she told them that she had heard about the robbery and Gleason, while Pinto was present, said that he did it. On cross-examination she testified that Gleason said, "Yes, that's what we did." No objections were taken to this testimony. Counsel for the defendants did object and take exception, however, to certain remarks of the judge occurring four days later in the trial. At that time requests were made to strike or limit certain testimony of Officer Sullivan with respect to his search of the apartment of Geraldine McLeod, also a defendant. Mr. Markella, counsel for another defendant

(Martin), requested an instruction that the jury were not to consider the conversation with Geraldine McLeod as to the defendant Martin as he had not been present. At this point the judge said, "I will instruct the Jury that at this time the testimony will be admissible only as against the party making the statements. I will instruct the Jury further, if and when they are satisfied on the evidence that all these parties were engaged in a common undertaking, plan, or enterprise, the statement of one of the participants in the enterprise and the acts of one engaged in a common enterprise is admissible against all, up to and until the enterprise comes to an end by arrest." Exceptions were saved to these remarks, which counsel asserts were made within the hearing of the jury. When the time came to charge the jury, counsel for the defence declined to submit any requests for instructions and indicated that they preferred to "sit back" and wait until the judge had given his charge and then request additional rulings. The court agreed to this procedure and charged the jury. The portion of the judge's charge here pertinent quoting from *Commonwealth* v. *Campbell*, 7 Allen, 541, 543–544, reads as follows: "There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that if he combines and confederates with others to accomplish an illegal purpose, he is liable . . . for the acts of each and all who participate with him in the execution of the unlawful design."

Somewhat later in the charge, the judge instructed the jury as to Audrey Pinto's testimony with respect to Gleason's remark, "We did it." He explained fully the law pertaining to tacit admissions and told the jury that it was for them to determine if the statement was made, if Pinto heard it and if it would have been natural for him to deny the statement. From a careful examination of the charge, it is clear that the judge instructed the jury that Gleason's remarks could be used only against Pinto as a tacit admission and not against Dirring who was not present when the

remark was made. It is, thus, hard to see how Dirring can now complain of the instruction so limited.

Dirring, however, now urges that if the jury did consider the remark to be a tacit admission on the part of Pinto, the comments made by the judge several days earlier concerning the statements of those engaged in a common enterprise might have led the jury to consider Pinto's tacit admission as evidence against Dirring. It is argued that this possibility rises to the level of reversible error because the judge failed to instruct the jury that inculpatory statements must be made in furtherance of the conspiracy.

This argument is tenuous and borders on the frivolous. No objection was taken at the trial to Audrey Pinto's testimony relating to Gleason's admission. None of the defendants requested that the jury confine their inferences to Gleason. The judge, however, did in fact limit the remarks to Pinto. There was nothing in the nature of the objections taken to the charge that would remotely suggest to the judge the point now pressed. The defendants take nothing by this assignment (No. 10).

9. Other assignments have not been argued and are treated as waived.

10. With respect to the defendant Pinto the entry must be: Judgment reversed and verdict set aside. With respect to the defendant Dirring the entry must be: Judgment affirmed.

*So ordered.*