COMMONWEALTH *vs.* RICHARD L. DEVLIN
(and a companion case.[1]).

Suffolk.    December 7, 1973. — April 22, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Homicide. Evidence,* Opinion, Admissions and confessions, Of criminal proceedings. *Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* New trial, Attendance of witnesses, Disclosure of evidence. *Witness,* Expert. *Words,* "Conviction."

At a murder trial, there was no error in a ruling that a radiologist of extensive experience especially in comparative analysis of x-rays of bones and joints was qualified to give, or in admitting in evidence, his opinion that x-rays of a badly decomposed human torso found some three months after the crime were of the same person as x-rays of the alleged victim taken before the crime [152-154]; there was no merit in a contention that "general acceptance" of a proffered medical opinion is a condition of its admission in evidence [154-155].

In the circumstances of a joint criminal trial of a defendant charged as a principal and a defendant charged as an accessory after the fact, the admission, as against the alleged accessory only, of certain out-of-court statements by him in which the alleged principal was not mentioned by name but there were references to "we" and "they," was not unconstitutional error under *Bruton* v. *United States,* 391 U.S. 123, in view of instructions to the jury. [155-161]

Although a closing argument by the prosecutor in a criminal case that the defendant instigated threats against a witness was clearly inappropriate in the state of the evidence against the defendant, it was not cause for reversal where the judge stated that he would take care of the matter in his charge, no exception was taken to that determination, and the judge did fully deal with the matter in his charge. [160]

---

[1] The companion case is Commonwealth *vs.* Robert Michael Wilson.

Where the defendant in a criminal case moved for a new trial and requested a summons of interstate witnesses to testify at the hearing on the motion, there was no abuse of discretion or other error of law in denial of the motion and the request where there was no reasonable basis for concluding, as contended by the defendant, that there were undisclosed agreements between State or Federal authorities and a witness or that the witness perjured herself concerning those agreements which had in fact been made. [161-162]

On the record of a criminal case, there was no merit in a contention by the defendant that a probation department report on the criminal record of a witness, furnished to the defence by the prosecutor at the direction of the court shortly before the witness testified, was prejudicially deficient in its contents. [163-164]

INDICTMENTS found and returned in the Superior Court on August 3, 1971.

The cases were tried before *Roy, J.*

*Rudolph F. Pierce* (*Charlotte Anne Perretta* with him) for the defendant Devlin.

*Kirk Y. Griffin* for the defendant Wilson.

*Stephen R. Delinsky*, Assistant District Attorney (*Thaddeus R. Beal, Jr.*, Deputy Assistant District Attorney, with him) for the Commonwealth.

WILKINS, J. The defendant Devlin appeals from a conviction of manslaughter in the death of one John James Rooney, Jr., on an indictment charging him with murder in the first degree. The defendant Wilson appeals from a conviction of being an accessory after the fact to manslaughter on an indictment charging him with being an accessory after the fact to the murder of Rooney. See G. L. c. 274, § 4. The cases were tried together before a jury under the provisions of G. L. c. 278, §§ 33A-33G.

In June, 1971, a human torso, badly decomposed, a hatchet imbedded in its chest, and missing its head, both hands, its right leg and external genitals, was discovered in the sea marsh at Patten's Cove, an inlet of Boston harbor, in the Dorchester section of the city of Boston. An autopsy established that the torso was that of a white male between the late teens and forty years of age and that death had

been caused by a gunshot wound. Although there was very little skin remaining on the torso, a determination was made from a small section of skin that the victim had had a tattoo on his left arm. In the absence of the head, which might have permitted identification of the victim through dental X-rays, and in the absence of the hands, which might have permitted identification through fingerprints, normal procedures for the identification of the body were not available. X-rays of the torso were taken.

At this time the Boston police department had in its files a statement that one John James Rooney, Jr., had been shot at 2 Deer Street, Dorchester, in the early morning hours of March 17, 1971. Rooney was a white male within the age span attributed to the torso found at Patten's Cove. Evidence at the trial showed that Rooney had had a tattoo on his left arm.

In a way not disclosed on the record, an associate medical examiner for Suffolk County became aware that the Boston City Hospital had X-rays of Rooney in its files. In September, 1970, as an outpatient Rooney had had two X-rays taken of his spine in the course of diagnosis of the cause of back pains; on March 9, 1971, he had again been admitted to the outpatient X-ray department of the Boston City Hospital and had X-rays taken of his right shoulder. The associate medical examiner enlisted the assistance of a radiologist, Dr. John Leland Sosman, to identify the torso. Dr. Sosman concluded that the torso was that of the same person under whose name the X-rays had been taken at Boston City Hospital.

The defendants contend first that it was prejudicial error to admit the opinion testimony of Dr. Sosman that the torso was that of the person who, under the name of John Rooney, Jr., had X-rays taken in September, 1970, and early March, 1971.[2]

---

[2] Much of Dr. Sosman's testimony was essential to the Commonwealth's proof. The Commonwealth had the burden of proving that Rooney was deceased. See *Commonwealth* v. *Webster*, 5 Cush. 295, 313-314 (1850); *Commonwealth* v.

Secondly, Devlin contends that he was denied his constitutional right to confront witnesses against him because of the admission in the joint trial of extra-judicial statements by Wilson which Devlin claims were inculpatory of him. Finally, Wilson argues that his motion for a new trial should have been allowed, or at least should now be considered further in the Superior Court, because the Commonwealth's principal witness against him committed perjury, because the Commonwealth did not adequately disclose promises made to that witness and because the Commonwealth improperly failed to furnish information which would have permitted the impeachment of that witness with records of prior convictions. The circumstances relating to these various contentions are set forth subsequently in this opinion. There was no error.

1. The opinion of Dr. Sosman that the X-rays of Rooney taken at the Boston City Hospital in 1970 and 1971 (the ante mortem X-rays) were of the same person as the X-rays of the torso found in June, 1971 (the post mortem X-rays) was properly admitted.

The admission of expert testimony lies largely in the discretion of the trial judge. *Commonwealth* v. *Spencer*, 212 Mass. 438, 448 (1912). *Commonwealth* v. *Millen*, 289 Mass. 441, 483 (1935), cert. den. sub nom. *Millen* v. *Massachusetts*, 295 U. S. 765 (1935). *Commonwealth* v. *Stirling*, 351 Mass. 68, 73-74 (1966). His ruling will be reversed on appeal only if it constituted an abuse of discretion or was otherwise tainted with error of law. *Commonwealth* v. *Capalbo*, 308 Mass. 376, 380 (1941). *Commonwealth* v. *Bellino*, 320 Mass. 635, 638 (1947). Clearly the subject of Dr. Sosman's testimony was not one of common knowledge on which the jury could reach a conclusion without expert assistance. *Commonwealth* v. *Capalbo, supra,* at 379. *Commonwealth* v. *Boyle*, 346 Mass. 1, 4 (1963).

*Williams,* 171 Mass. 461, 462, 465 (1898); Wigmore, Evidence (3d ed.) § 2081 (1940). Without Dr. Sosman's testimony, the death certificate stating that the torso was Rooney's and the associate medical examiner's statement that he based his conclusion on Dr. Sosman's opinion would have been inadmissible.

The defendants assert, however, that Dr. Sosman lacked the necessary qualifications to justify admission of his testimony that no two adult humans have the same bone configuration and that the ante mortem and post mortem X-rays taken were of the same body. In addition, they contend that it was necessary for the Commonwealth to establish that the theory used by Dr. Sosman had received "a general acceptance by the community of scientists involved." *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963).[3] In order to assess these arguments of the defendants, a summary of salient portions of Dr. Sosman's testimony is required.

Dr. Sosman testified extensively concerning his education, training and experience. That testimony established far more than an adequate basis for the judge to rule that Dr. Sosman was a highly qualified radiologist of extensive experience in the practice and teaching of radiology and more particularly in the comparative analysis of X-rays of bones and joints. A major portion of his practice was devoted to the comparison of X-rays taken of patients at different times. In his practice he had viewed somewhere between 800,000 and 1,000,000 X-rays, involving comparisons of approximately 300,000 X-rays. He testified that the bone structure of each person has taken on unique characteristics by the time he is in his twenties. He said that as far as he knew no two human beings have the same bone configuration. Each individual is unique in that respect. He had himself once successfully conducted a "double-blind study" to test his ability to match X-rays of the same person.[4] Dr. Sosman testified that he had used X-rays in other situations to identify unknown human re-

---

[3] The *Fatalo* case dealt with the admissibility of the results of polygraph ("lie-detector") tests. It was thus involved with "a scientific theory or instrument" as to which this court, following the landmark case of *Frye* v. *United States*, 293 Fed. 1013 (D. C. Cir. 1923), indicated that support by substantial authority to establish scientific reliability was a precondition to the admissibility of an opinion based on the results of such a scientific instrument or theory.

[4] One hundred ten X-rays of the chest had been given Dr. Sosman as if they were of known persons. One hundred ten other chest X-rays, unmarked and treated as unknown, had also been given to him. Only 100 X-rays in each group were of a person whose X-ray was in the other group.

mains but that he had never before testified in a criminal case as to the identification of unknown remains, and as far as he knew, no one else ever had. He was one of about three or four people in the country who did bone and joint work of the type he performed, and he did more than anyone else. Articles had been published in learned journals concerning identification of unknown human remains by X-ray. He had copies of some of them with him and mentioned several by name.

The judge ruled that Dr. Sosman was qualified to give an opinion concerning the identification of the torso. The defendants excepted. Dr. Sosman, using the X-rays and equipment for showing them, then explained what they showed. He also used a plastic model of the spine to point out the individual parts of the vertebrae which take on a slightly different shape in each individual and on which differences he based his identification. He testified that the two groups of X-rays were of the same person. He gave a detailed explanation of how he arrived at his conclusion, the steps he took and the circumstances he relied on. On cross-examination he testified that he reached his conclusion by visual comparison and not by measuring the points of reference he used. He agreed that there was no standard procedure established to conduct tests of the sort he did with the ante mortem and post mortem X-rays. He said that he found no points of dissimilarity between the two groups of X-rays.

From this description of the procedure followed by Dr. Sosman, we believe that it is clear that the subject on which Dr. Sosman gave his opinion was one which the judge could rightly find was within Dr. Sosman's field of experience. Additionally, Dr. Sosman's opinion as to the uniqueness of the bone structure of a mature human was one which the judge could reasonably have concluded Dr. Sosman was qualified to make.

The defendants contend that the opinions of Dr. Sosman were inadmissible because there has been no "general acceptance by the community of scientists involved" of the "scientific theory or instrument" used. *Commonwealth* v.

*Fatalo, supra,* at 269. Certainly the use and reading of X-rays and the comparison of X-rays is a generally recognized medical practice. See *McGrath* v. *Fash,* 244 Mass. 327, 328-329 (1923). Thus we are not concerned with an unproven or disputed "scientific instrument" as in the case of polygraphs and other devices. Nor are we concerned with a "scientific theory" in the sense in which those words are used in the *Fatalo* case. Dr. Sosman's medical opinion that no two adults have identical bone structures was not the product of a "scientific theory" but was, rather, the product of years of experience viewing tens of thousands of X-rays. The history of the admission of opinions of medical experts in this Commonwealth belies the defendants' contention that "general acceptance" of a proffered medical opinion is a condition of the admissibility of that opinion in evidence. The defendants' objection to the admission of Dr. Sosman's testimony and the death certificate which was based on that testimony is without merit.

2. Relying on the principle adopted in *Bruton* v. *United States,* 391 U. S. 123 (1968), Devlin argues that evidence of certain extrajudicial statements made by Wilson, although admitted solely against Wilson with limiting instructions, were so incriminating of Devlin that he was denied rights secured by the confrontation clause of the Sixth Amendment of the Constitution of the United States. Although Devlin was not mentioned by name in any of Wilson's statements, Devlin contends that the circumstances of the statements show that the jury must have accepted references to "we" and "they" in Wilson's statements as including Devlin. Wilson did not testify.

The judge may have regarded the *Bruton* rule as inapplicable because Devlin was not mentioned by name in Wilson's statements. Although there is some authority for such a limited view of the *Bruton* rule, we have recently suggested that a more reasonable application of the *Bruton* doctrine recognizes that the inculpatory connection need not appear in the statement itself and "may be supplied by *the content of the statement taken in connection with other evidence in the case*" (emphasis in the original). *Com-*

monwealth v. *LeBlanc,* 364 Mass. 1, 8, (1973). Accepting this latter view of the scope of the *Bruton* doctrine, we will review the statements attributed to Wilson to determine whether there was a substantial risk that in determining Devlin's guilt the jury relied on "powerfully incriminating extrajudicial statements of a codefendant, who . . . [stood] accused side-by-side with the defendant." *Bruton* v. *United States, supra,* 126, 135-136.

The first extrajudicial statement made by Wilson to which Devlin objects on *Bruton* grounds was testified to by one David Egan. In his direct examination Egan testified that in the early morning of March 17, 1971, he had seen Devlin, gun in hand, in a room in a house on Deer Street in Dorchester. Rooney was lying on the floor, moaning, apparently shot. Devlin ordered Egan to leave.

Egan subsequently testified that some six weeks later, in early May, 1971, Egan was working as a house painter at a house in Dorchester. A car drove up with three men in it. One man got out of the car. At the trial Egan identified that man as the defendant Wilson. The court then admitted in evidence, against Wilson alone, the conversation which Wilson had with Egan at the house in Dorchester. In that conversation, which is set forth in full in the margin,[5] Wilson said that Egan's life was in danger if he did not cooperate with respect to any testimony in the Rooney

---

[5] Q. (by the prosecutor) "Will you tell us the conversation, Mr. Egan, what he said and what you said?"

A. "He approached me and said 'I'm Peter Quish. I'm here about the Rooney matter.' "

Q. "And did you say something then?"

THE JUDGE: "Why don't you just let this man tell the conversation as he remembers it? 'I'm Peter Quish. I'm here on the Rooney matter,' is that right?"

THE WITNESS: "Yes. And I said 'I assume that.' And then he says, 'Are you going to go along with it like Holt? Are you willing to go along with it like Holt?' And I said, 'Positively, yes.' I said, 'I don't want any confusion. I don't want to get involved in it.' And he said to me, 'Well, that's what we heard.' He said, 'Would you be willing to go see a lawyer and sign a statement?' I said, 'Yes,' and then he says, 'You know we have had you watched. We could have had you any time. We have had a guy outside your house with a shotgun.' And I said, 'Oh, yeah,' and he said, 'Yes, we know you have been staying at your brother's house. We don't know where.' And he just said — from there he just says, 'Are you willing?' And I said, 'Yes. When do you want me to go see the lawyer?' He says, 'I will keep in touch with you. We got your number.' And that was the end of the conversation."

matter. Although there was no explicit indication who was referred to as "we" in that conversation, it is apparent that Wilson did not want Egan to testify about what he knew about the death of Rooney.

The next conversations between Wilson and a witness, to which Devlin objects on *Bruton* grounds, took place after Wilson had been arrested on the charge of being an accessory after the fact to Rooney's murder. These conversations were between Wilson and a woman, identified as Toni Clements. She testified that she had lived with Wilson for almost two years and had had a child by him and that he said he used the alias Peter Quish. About two weeks after his arrest Clements talked with Wilson at the Billerica house of correction. This conversation was admitted without objection but solely against Wilson upon a request for a limiting instruction by counsel for Devlin. The conversation described how certain persons, identified (except for Wilson himself) only as "they" and "we," had undertaken to dispose of the body.

On cross-examination of Clements by counsel for Wilson, Clements testified that Wilson told her that Rooney died as a result of an accident and then later on redirect examination corrected her testimony to state that Wilson said that Rooney was shot in self-defence.

Finally Devlin argues that the *Bruton* principle was violated by the admission of a conversation between Wilson and one Thomas Holt at a lounge where Wilson was employed. Holt testified to a conversation he had with Wilson at the end of April or early in May, 1971. This conversation was admitted in evidence solely against Wilson. In that conversation, a portion of which is set forth in the margin,[6] Wilson, whom Holt had not met previously, said he wanted to talk to Egan. At the conclusion of this

---

[6] "He [Wilson] says, 'Tom,' he says, 'I know you have been to the police.' He says, 'I know you and Dave Egan have made statements.' He says, 'For $50,' he says, 'You have a wife, you have a business, you have a company. Davey's married. He has a wife and children.' He says, 'Jackie Rooney was no good. He was an "F"-ing rat. He deserved to have his head chopped off.' He said, 'We waited outside of Davey's house.' He said, 'We know he is not staying there. We know he is at one of his brother's houses. We don't know which one it is. I believe he's got

testimony counsel for Devlin moved for a mistrial which was denied.

Devlin also objects to the references to these statements of Wilson to Holt in the Commonwealth's opening and in its summation to the jury. The prosecutor's opening statement to the jury, which need not be summarized in this respect, presented a reasonable description of Wilson's statement to Holt as it ultimately came into evidence. The opening, therefore, constituted no prejudice to Devlin beyond whatever prejudice was created by that extrajudicial statement itself. In his summation to the jury the prosecutor argued that "they" (an indefinite reference) had done certain things to Rooney's body and disposed of it. He argued that "Devlin had another choice besides destroying the corpse . . . . His other choice was to have Egan killed . . . [or] so terrified that no matter what happens he would, under no circumstances, testify in this case." The prosecutor then argued that Devlin went to Wilson, "the man with connections all over the country." The Commonwealth had brought out during the trial that Devlin and Wilson knew each other and had been seen together many times.

Devlin finally argues that the judge compounded the

about ten brothers.' He said, 'If he had found him,' he said, 'We would have murdered him.' He says, 'I want to know where you stand in this case.' I says, 'I don't know nothing,' you know, and I asked him, I said, 'How did you get my phone number?' He says Bonnie gave it to him. And I went on to him and I said, 'I made statements to the police.' I said, 'David was scared. He felt he was being set up. He thought you were going to murder him.' I says, 'You can't blame the kid, so I went to the police department. I spoke with the police department. . . .' So with that he says, 'I am not afraid of you,' he says, 'You don't know nothing. All you know is what Davey told you.' He says, 'I got to meet Davey.' He said, 'I got to talk to him.' He says, 'I want Davey to meet with an attorney.' I said, 'I will never bring you to Davey because I don't trust you.' He says, 'Hey, you don't have to worry about nothing.' He says, 'Jack Rooney is gone.' He says, 'They will never find him and if they do find him, they won't even recognize him.' So I said, 'I'll speak to Davey.' He says, 'Well, where are you working?' I said, 'We are working over behind the Edison Company painting a white house over there.' . . . Well, when the conversation took place, he sat down for a while and he had a few friends; he kept going from table to table and he said to me, 'See the guys sitting at the table?' There were three of them. I said, 'Yes.' He says, 'They are from different states.' He said, 'I am connected all over the United States.' He says, 'If this thing ever comes to a head, screws up, I may go away for life, but you will get it no matter where you go.' "

*Bruton* problem in his charge. He instructed the jury on manslaughter, referring (but not by name) to Clements's testimony that she was told the shooting was in self-defence. Although there was in the circumstances other evidence which would have warranted submission of the question of manslaughter to the jury, this portion of the charge benefited Devlin at least "at first blush," as Devlin concedes. Devlin argues, however, that this instruction concerning evidence of self-defence suggested to the jury that all of Clements's testimony concerning Wilson's extra-judicial statements was to be considered in the case against Devlin. We do not agree.[7]

The judge separated the two cases in his charge to the jury, clearly repeating his instruction that Wilson's extra-judicial statements were admissible solely against Wilson. He also charged that Wilson could not be found guilty, if Devlin were found not guilty. This instruction further separated the two cases for consideration by the jury.[8]

We come then to a consideration of the appropriate application of the *Bruton* case to these facts and conclude that there was no *Bruton* error. This is not a case of the introduction in evidence of a confession or admission by a codefendant (Wilson) bearing on that codefendant's guilt of the same crime as that for which the defendant (Devlin) was charged. There is, of course, the possible inference that Devlin might have been one of those who helped dispose of Rooney's body and might have been one of those uniden-tified persons who would join in the carrying out of threats

---

[7] We believe that, taking the judge's charge as a whole, the jury could not reasonably have considered her entire testimony as applicable to Devlin. In considering this argument we have accepted Devlin's claim that the evidence concerning self-defence was admitted solely against Wilson, although that testimony came in without objection on cross-examination of Clements by Wilson's counsel and on clarifying redirect examination by the Commonwealth.

[8] If, as Devlin argues, Wilson's extrajudicial statements were incriminating of Devlin, the judge might have charged that Wilson's statements could be considered in the case against Wilson to prove that Devlin killed Rooney (a necessary element of that case) but could not be considered for the same purpose in the case against Devlin. Such an esoteric treatment of Wilson's statements would have explicitly created the *Bruton* problem which Devlin argues existed inferentially.

against Holt and Egan.[9] This inference does not constitute a "powerfully incriminating extrajudicial statement" (*Bruton* v. *United States,* 391 U. S. at 135 [1968]) against Devlin. It does not identify Devlin as the person who shot Rooney. Whether he was the one who shot Rooney or was not, Devlin no doubt did not want Egan to testify against him.

The defendants were charged with different crimes which occurred at different times. The evidence against each defendant was, therefore, severable by the jury in their consideration of the two indictments. The judge's charge made clear to the jury a separation of the evidence which they had to respect.

The closing argument of the prosecutor that Devlin instigated the threats against Egan was clearly inappropriate in the state of the evidence against Devlin. Counsel rightly objected to that argument promptly on the conclusion of the Commonwealth's closing argument. The judge stated that he would take care of the matter in his charge. No exception was taken to that determination, and in his charge the judge fully dealt with the matter.

Federal courts dealing with assertedly inculpatory inferences, some less tenuous than those asserted to be involved here, have similarly declined to extend the *Bruton* doctrine to require reversal of the conviction of an objecting codefendant. *Cortez* v. *United States,* 405 F. 2d 875, 876 (9th Cir. 1968), cert. den. 397 U. S. 926 (1970). *United States* v. *Lipowitz,* 407 F. 2d 597, 601-603 (3d Cir. 1969), cert. den. sub nom. *Smith* v. *United States,* 395 U. S. 946 (1969). *Slawek* v. *United States,* 413 F. 2d 957, 964 (8th Cir. 1969). *United States ex rel. Nelson* v. *Folette,* 430 F. 2d

---

[9] The inference was not compelling. In the threatening conversation with Egan the indefinite references could well have been designed to suggest the existence of numerous people who, wherever Egan went, would carry out Wilson's threat. The reference may reasonably have been to the others who stayed in the car while Wilson talked to Egan. In portions of Clements's testimony, not quoted in footnote 6, there were several named associates referred to, whose assistance Wilson was seeking in various ways. In the Holt conversation the reference to others clearly included persons in the cocktail lounge where they talked. There was no evidence that Devlin was in the vicinity, or even in the Commonwealth, when the threatening conversations occurred.

1055, 1058 (2d Cir. 1970), cert. den. sub nom. *Nelson* v. *Zelker,* 401 U. S. 917 (1971). *United States* v. *Trudo,* 499 F. 2d 649, 652-653 (2d Cir. 1971), cert. den. sub nom. *Trudo* v. *United States,* 405 U. S. 926 (1972). See *Commonwealth* v. *French,* 357 Mass. 356, 372 (1970) judgments vacated as to the death penalty sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936 [1972]); *Commonwealth* v. *McGrath,* 358 Mass. 314, 322 (1970). In the circumstances, the admission of Wilson's statements, limited to the case against Wilson, was not constitutional error under the *Bruton* rule. The limiting instructions were sufficient to avoid any unfairness to Devlin. *Commonwealth* v. *LeBlanc,* 364 Mass. 1 (1973).

3. The defendant Wilson also appeals from the denial of his motion for a new trial. Certain of the grounds set forth in that motion have been disposed of earlier in this opinion.[10] In addition, Wilson argues that he should have been granted a new trial because (1) Clements perjured herself concerning the terms and conditions of the agreement offered her by the government in exchange for her testimony, and (2) the prosecution failed to disclose the true criminal record of Clements and failed to disclose "the known contents of the agreement between ... [her] and her then present and prospective prosecutors," thus making it impossible to provide effective cross-examination of Clements. Wilson also argues that the judge erred in denying the defendants' request for summons of interstate witnesses to testify at the hearing on the motion for a new trial (Clements and Mr. Joseph Kiel, an attorney in the "Baltimore Strike Force" of the United States Department of Justice). The judge found that Wilson had not sustained his burden of proving that Clements committed perjury in her testimony and that there was no basis for the claim that cross-examination of Clements was impeded by any failure to disclose any agreement between Clements and the government concerning pending or future prosecutions

---

[10] Devlin joined in the motion for a new trial and appeals from its denial. All of the asserted grounds for a new trial on which Devlin might reasonably rely have already been dealt with in this opinion.

against her. He denied the motion for a new trial. He also denied the request for summons of out-of-State witnesses. There was no abuse of discretion or other error of law in the judge's rulings.

In the course of the trial the assistant district attorney disclosed to defence counsel and the court agreements which had been made with Clements. The Suffolk County district attorney's office had promised Clements that any coöperation she gave that office in the pending case would be made known to any court that might dispose of any cases against her in the Commonwealth. Additionally an F. B. I. report was made available in which Mr. Kiel is stated to have told Clements that if she testified about substantial crimes, he would recommend to the Department of Justice that it protect her and her two children and provide eventual relocation to a different section of the country. The defendants used this information in cross-examining Clements.

A review of the evidence offered at the hearing on the motion for a new trial gives no reasonable basis for concluding that there were undisclosed agreements between the government (State or Federal) and Clements or that Clements perjured herself concerning those agreements which had in fact been made. [11] The fact that the Federal government may have subsequently done certain things for Clements, as argued by Wilson, does not aid him. These conclusions also support the discretionary decision of the judge to deny Wilson's request to summon Clements and Mr. Kiel to testify at the hearing on the motion for a new trial. See *Commonwealth* v. *Dirring*, 354 Mass. 523, 530 (1968).[12]

---

[11] Any inconsistency between those agreements as then disclosed and Clement's testimony was a proper subject for impeachment at the trial and may not properly be raised on a motion for a new trial.

[12] The statements of Mr. Kiel to a grand jury in Baltimore concerning Clements, made in connection with her testimony before that grand jury the day before she testified in this case, do not give reasonable support to Wilson's argument that she had already been granted protection from prosecution there.

There remains to be considered the argument that the probation department report on the criminal record of Clements, as furnished to defence counsel on direction of the judge two days before Clements testified, was prejudicially deficient. The probation department report indicated that certain 1970 and 1971 District Court complaints against Clements had been placed on file. That report did not disclose, as entries on the complaints indicate, that a finding of guilty had been made before each complaint was placed on file. Wilson argues that if the probation report had disclosed the guilty findings in each instance, he would have been sufficiently informed so as to use records of those guilty findings to impeach Clements. Certain of the complaints involved felonies; the others involved misdemeanors.

Under G. L. c. 233, § 21, as amended by St. 1950, c. 426, the conviction of a crime may be shown to affect the credibility of a witness under certain prescribed circumstances. Distinctions are made between misdemeanors and felonies. Among those distinctions appears the provision as to felonies, added by St. 1950, c. 426, that "a finding . . . of guilty shall constitute a conviction within the meaning of [G. L. c. 233, § 21]." No similar language exists providing that a finding of guilt in a misdemeanor case alone constitutes a conviction for the purposes of G. L. c. 233, § 21. These distinctions between felony and misdemeanor convictions in § 21 are intentional. *Forcier* v. *Hopkins*, 329 Mass. 668, 671 (1953). We think it clear that the findings of guilt in the misdemeanor cases could not have been the basis for impeachment of Clements under § 21 because standing alone they were not convictions. *Commonwealth* v. *Hersey*, 324 Mass. 196, 205 (1949). On the other hand, by statutory definition the findings of guilt in the felony matters had a different status from the guilty findings in the misdemeanor proceedings.

It is not necessary, however, for us to resolve the question whether records of the guilty findings in the felony cases were proper material for impeachment because Wilson

never offered them for that purpose at trial. The probation department report sufficiently advised Wilson of the possibility that a finding of guilt was made in each felony proceeding before it was placed on file. With that information in hand, the burden rested on the defendant Wilson to investigate the circumstances.[13] No request was made for a continuance or for the availability of Clements for recall as a witness after further investigation. There was no error in the denial of Wilson's motion for a new trial on the ground that the prosecution failed to disclose Clements's criminal record. When the probation department report was given to counsel for Wilson, any constitutional requirement on the prosecution to disclose material evidence was fully met. Compare *Giglio* v. *United States*, 405 U. S. 150, 153-154 (1972).

*Judgments affirmed.*

---

[13] We emphasize here the desirability in many cases, upon motion of counsel, for a court order making available to counsel the central probation records as to prior convictions. Such an order may avoid the guesswork, time and trouble involved in court-by-court research by counsel for such records. But this sensible assistance to defence counsel does not impose upon the Commonwealth any duty of investigation of these details, or any duty to defend the accuracy or completeness of the information.