******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DIANE WILLIAMS
## (AC 40953)

Elgo, Cradle and Devlin, Js.

*Syllabus*

The defendant, who had been convicted of the crime of larceny in the first degree, appealed to this court, challenging various evidentiary rulings by the trial court and its denial of her request to secure the attendance at trial of several out-of-state witnesses pursuant to statute (§ 54-82i). The defendant had been a finance director for the state chapter of the American Red Cross and was responsible for reporting payroll information to P Co., which produced payroll checks and made direct deposits into American Red Cross employees' bank accounts. The defendant was responsible for using SPIN, an online reporting system, to report employee salaries and benefits to the national chapter of the American Red Cross. After the defendant's employment was terminated following a merger of several American Red Cross chapters, her responsibilities were taken over by L, the chief financial officer for the Connecticut American Red Cross. L compared P Co.'s records to the SPIN reports that the defendant had submitted and discovered that the defendant had paid herself $409,647.47 more than she was entitled to while she was employed by the American Red Cross. Thereafter, the defendant gave state police detectives a written, six page statement in which she admitted that she had embezzled money from the American Red Cross. *Held*:

1. The defendant could not prevail on her claim that the trial court abused its discretion in admitting the SPIN reports into evidence pursuant to the statutory (§ 52-180) business records exception to the rule against hearsay because nothing in L's testimony indicated that the American Red Cross prepared the SPIN reports in the regular course of business; the record plainly indicated that the three statutory requirements for the admissibility of the SPIN reports under the business records exception to the hearsay rule were satisfied, as L testified that the defendant was responsible for submitting individual payroll information to the national chapter of the American Red Cross, that the national chapter of the American Red Cross would create SPIN reports for pension and insurance purposes, and that the creation of SPIN reports was in the normal course of business for the national chapter of the American Red Cross.

2. The trial court did not abuse its discretion in sustaining various evidentiary objections by the state to certain documents and testimony that the defendant proffered at trial, the defendant having failed to demonstrate that any of the court's rulings were harmful; the state presented overwhelming evidence of the defendant's guilt, most notably her confession, which she read, signed and corrected, and which was sufficiently corroborated by her intimate knowledge of details of the crime and the testimony of one of the detectives that the defendant reviewed and understood the statement before swearing to its accuracy.

3. The defendant's claim that the trial court abused its discretion by denying her request for certificates to subpoena out-of-state witnesses pursuant to § 54-82i (c) and by considering the timeliness of her request was unavailing:

a. The limited nature of the defendant's proffer at trial failed to demonstrate that the witnesses were material and necessary, as she provided generalized allegations in her written applications as to what they could testify to and what documents they could provide, her appellate counsel's more specific references to offers of proof at oral argument before this court pertained to collateral issues that were immaterial to whether she embezzled funds, and much of the proffered testimony would have been cumulative because similar issues had already been explored during cross-examination; moreover, the defendant made no offer of proof that the testimony of the proposed witness who was the source of the SPIN information would have challenged the reliability or authenticity of the SPIN reports.

b. The trial court's consideration of timeliness and delay as a factor in

determining whether to grant the defendant certificates was not an abuse of discretion: contrary to the defendant's claim that whether she would have had the time to secure the witnesses was not relevant, a delay of the trial for an indeterminate amount of time as a result of the issuance of the certificates was not inconsequential, as the court had confirmed the trial schedule with counsel so that it could advise venire-persons of the time commitment expected of them at trial, and considered that the case had been pending for more than five and one-half years and that the defendant could have taken numerous steps to secure the testimony of the witnesses in the fifteen months since the mistrial in this case; moreover, nothing in § 54-82i (c) impaired the court's obligation to oversee the management of the trial and the impact that delays could have on the availability of jurors, trial dates and the court's docket, and the complicated procedural and logistical consequences that arise from the issuance of certificates pursuant to § 54-82i (c) underscored the defendant's need to make timely and adequately supported applications to the court.

Argued September 10, 2020—officially released January 26, 2021

*Procedural History*

Substitute information charging the defendant with the crime of larceny in the first degree, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *B. Fischer, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, deputy assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Peter A. McShane*, former state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Diane Williams, appeals from the judgment of conviction, rendered after a jury trial, of larceny in the first degree in violation of General Statutes § 53a-122 (a). On appeal, the defendant challenges the propriety of various evidentiary rulings and the denial of her request to secure the attendance at trial of several out-of-state witnesses. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. The defendant was a finance director for the American Red Cross, Middlesex County chapter (chapter). She was hired by Brenda J. Simmons, who was the executive director of the chapter. The American Red Cross employed both hourly and salaried employees; the defendant's position as finance director was a salaried position. Unlike hourly employees, American Red Cross employees who were salaried were not entitled to overtime. As finance director, the defendant was responsible for reporting the chapter's finances to Simmons, which included payroll, accounts payable and receivable, as well as assisting Simmons in preparing budgets. From 2006 to 2010, the salary for the finance director position at the American Red Cross ranged from $49,000 to $57,000. The American Red Cross had a "use it or lose it" policy with regard to vacation time, pursuant to which employees would forfeit their unused vacation time if it was not used by March 1 of the following year.

As part of her payroll responsibilities, the defendant was required to fill out payroll information in an online data entry system and then report that information to Paychex, a payroll processing company. Paychex used that information to produce payroll checks and to make direct deposits into employees' bank accounts. The defendant was the only chapter employee responsible for communicating with Paychex. When Paychex delivered the paychecks, the defendant personally received them. Simmons was not responsible for reviewing correspondence from Paychex. Additionally, the defendant was responsible for submitting "SPIN reports." SPIN is an online reporting system utilized by local chapters of the American Red Cross to report employee salaries and benefits to the national chapter of the American Red Cross (national). SPIN reports, thus, were intended to be an accurate reflection of what a person earned as an employee of the American Red Cross.

On June 30, 2010, the defendant's employment was terminated following the merger of several chapters of the American Red Cross, which eliminated the need for her position. At that time, Paula Lajoie, the chief financial officer for the Connecticut American Red Cross, took over the defendant's responsibilities. In

2011, while conducting a closeout audit of the chapter, Lajoie sought payroll information that had been maintained by the defendant. Despite searching the chapter's entire building, including the defendant's former office, Lajoie was unable to locate payroll records for the chapter's employees. That search raised other concerns for Lajoie, as she was unable to locate any of the payroll records that the defendant had been responsible for archiving. In addition, the defendant's work computer had been "wiped clean," and Lajoie was unable to find any of the defendant's human resource records. The defendant was uncooperative when questioned by Lajoie.

Thereafter, Lajoie obtained records from Paychex to review the defendant's compensation while employed with the American Red Cross. Lajoie discovered that the defendant's actual compensation was significantly greater than the $47,000 to $57,000 typical salary range for the position of finance director and the figures that the defendant had reported to the American Red Cross through internal SPIN reports.[1] The defendant's W-2 tax forms, which were admitted into evidence at trial, confirmed that the Paychex records accurately reflected how much the defendant had been paid by the American Red Cross. A comparison of the Paychex records to the internal SPIN reports submitted by the defendant revealed that the defendant had paid herself $409,647.47 more than she was entitled to.

On September 28, 2011, Detective Anthony Buglione, who was assigned to the state police Central District Major Crime Squad, and his partner, Detective Kevin A. Slonski, interviewed the defendant at her home regarding her inflated earnings. The defendant at that time agreed to provide an oral statement, which was transcribed by Buglione. After the interview was complete, the defendant signed Buglione's transcription of their conversation.[2] In that six page statement, the defendant admitted that she had embezzled money from the American Red Cross from 2006 to 2010. On the basis of that signed confession, the defendant was charged with larceny in the first degree in violation of § 53a-122 (a).[3] Following a jury trial, the defendant was found guilty of larceny in the first degree. The court rendered judgment accordingly, sentencing the defendant to a term of thirteen years of incarceration, execution suspended after eight years, and five years of probation. This appeal followed.

On appeal, the defendant raises sixteen claims of error, divided into three groupings: (1) whether the court improperly admitted her SPIN reports; (2) whether the court improperly sustained various evidentiary objections by the state; and (3) whether the court erred in its denial of her request to secure the attendance of several out-of-state witnesses.[4]

I

The defendant first claims that the court abused its discretion by admitting into evidence state's exhibit 7, a spreadsheet containing the defendant's SPIN reports that summarized her biweekly salary and payroll earnings from 2006 to 2010. We disagree.

"The standard for review of evidentiary rulings is well established." *State* v. *Carpenter*, 275 Conn. 785, 815, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 542, 864 A.2d 847 (2005).

The following additional facts are relevant to the defendant's evidentiary claim. At trial, the state sought to introduce into evidence the defendant's SPIN reports so that the jury could compare the figures that she had reported to national with her W-2 tax statements. That comparison would demonstrate that the defendant had received hundreds of thousands of dollars more in compensation than what she reported to national. To lay the appropriate foundation for this evidence, the state's attorney questioned Lajoie as follows:

"Q. Okay. . . . [I]s that report kept in the ordinary course of business by the American Red Cross?

"A. Yes, it was.

"Q. And are those SPIN numbers or the numbers reflected there recorded at or about the time that someone receives a paycheck for benefit purposes?

"A. Yes. They were filed each pay period."

When the state attempted to offer the defendant's SPIN report into evidence, the defendant conducted a voir dire of Lajoie, in which Lajoie conceded that she did not know who prepared the SPIN reports. The court asked Lajoie if she prepared the document, and Lajoie confirmed that she did not. The court then sustained the defendant's objection but advised the state that it might be able to admit the report with additional foundation.

Later in its direct examination of Lajoie, the state again attempted to offer the SPIN reports into evidence. The court at that time heard arguments on the admissibility of the SPIN reports. During that exchange, defense counsel argued that "one of the problems is [that the SPIN reports contained in exhibit 7 do not] even have

any indicia of reliability. It just . . . doesn't even look like an official document. It has no Red Cross marking." In response, the court engaged in the following colloquy with Lajoie:

"Q. . . . [A]s far as the salary of a Red Cross employee . . . in the regular course of business, if you wanted to find out the salary of a Red Cross employee, you would go to national, and they would, basically, produce a SPIN report on that employee?

"A. Normally, you would go to a human resources file. We went to SPIN because that file was missing.

"Q. All right. But the SPIN accurately reflects the salary of a Red Cross employee?

"A. Yes.

"Q. All right. And you have observed . . . many of these . . . SPIN reports of Red Cross employees?

"A. Yes.

"Q. So, in the regular course of business for [national], they keep, if requested, SPIN reports on employees; correct?

"A. They did. They're not using the system now, so I just want to clarify.

"Q. But, back then?

"A. But, back when they did use that system . . . yes.

"Q. You know, whether someone is a . . . clerical worker or finance director . . . you could find that out; correct?

"A. Yes.

"Q. And is that information provided by the employee to national? In other words, does [the defendant] submit that to national?

"A. It was done through finance. So, in this case, it would have been [the defendant], but in her capacity as a finance person, [not as an employee]—

"Q. All right. Submitting this . . . to [national so a SPIN report could be produced?] . . .

"A. It drove some of the pension and insurance, so it was used in that capacity.

"Q. All right. And that's in the normal course of business for the national; is that correct?

"A. Yes."

In light of that testimony, the trial court admitted the defendant's SPIN report into evidence.

On appeal, the defendant argues that the court abused its discretion in admitting the defendant's SPIN reports because that evidence was hearsay and did not satisfy the requirements of the business records exception to the hearsay rule. The state counters that the SPIN

reports fall under the business records exception to the hearsay rule because testimony established that the records were "kept in the ordinary course of business by the [American Red Cross] . . . ." (Internal quotation marks omitted.)[5] We agree with the state.

"Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. . . . Unless subject to an exception, hearsay is inadmissible. . . . If the proffered evidence consists of business records, the court must determine whether the documents satisfy the modest requirements under [General Statutes] § 52-180 to admit them under the business records exception to the hearsay rule." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Midland Funding, LLC* v. *Mitchell-James*, 163 Conn. App. 648, 655, 137 A.3d 1 (2016). "To be admissible under the business record[s] exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in . . . § 52-180. The court must determine, before concluding that it is admissible, [1] that the record was made in the regular course of business, [2] that it was the regular course of such business to make such a record, and [3] that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . In applying the business records exception, the statute . . . should be liberally interpreted. . . . In part, this is because the statute recognizes the inherent trustworthiness of documents created for business rather than litigation purposes." (Citation omitted; internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 240–41, 777 A.2d 633 (2001). "[Our Supreme Court] repeatedly has held that [i]t is not necessary . . . that the witness have been the entrant himself or in the employ of the business when the entry was made. . . . It is sufficient for a witness to testify that it was the regular business practice to create a document within a reasonable time after the occurrence of the event. This is sufficient to ensure that the document was created at the time when the event was fresh in the author's mind. . . . To require the defendant to produce a witness that could testify from personal knowledge as to the specific time that a particular document was made would unduly constrain the use of the business records exception and directly contradict the liberal interpretation that this court has accorded to § 52-180." (Citations omitted; internal quotation marks omitted.) Id., 241–42.

The defendant concedes that the first and third elements of the business records exception were satisfied by Lajoie's testimony. Nevertheless, she argues that the second requirement for the business records exception was not met at trial because "[n]othing in [Lajoie's] testimony indicates that the Red Cross prepared [the defendant's SPIN report] in the regular course of business." We disagree.

The defendant argues that the present case is analogous to *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 595 A.2d 839 (1991). In *River Dock & Pile, Inc.*, the plaintiff sought to admit a document into evidence pursuant to the business records exception. To do so, the plaintiff offered the testimony of a witness, who stated that the document "was kept in the [business'] files, and . . . was prepared in the ordinary course of business . . . ." Id., 795. The witness nonetheless "did not testify as to whether it was in the regular course of [the business] to make such a record or whether the record was made at or within a reasonable time of the act described in the exhibit." Id., 795–96. On appeal, our Supreme Court agreed with the defendant that the trial court had improperly admitted the document under the business records exception. Id., 797. As the court explained, the plaintiff had offered "no testimony as to whether it was the regular business to make such a record or whether the record was made at or near the time of the act described in the report. A brief examination of the document indicates that the latter requirement was satisfied by notations in the document itself, but we find nothing in the testimony of [the witness] to indicate that it was in the regular course of business of the [business] to prepare such a record." (Footnote omitted.) Id., 796–97. The court further noted that, "[a]lthough § 52-180 is to be liberally construed, we cannot allow any of the three statutory requirements for the admission of business records to be ignored completely." Id., 797. The court thus concluded that the trial court improperly admitted the document in question under the business records exception. Id.

Unlike in *River Dock & Pile, Inc.*, Lajoie's testimony in the present case established that the American Red Cross generated SPIN reports in the regular course of business for pension and insurance purposes. During the colloquy with Lajoie, the court asked if the defendant, in her capacity as finance director, was responsible for submitting individual payroll information to national. Lajoie responded in the affirmative. The court also asked if the payroll information was submitted to national so that SPIN reports could be produced by the American Red Cross. Lajoie answered that national would create SPIN reports for pension and insurance purposes. Finally, the court asked if creating SPIN reports was "in the normal course of business for [national]." Lajoie again answered in the affirmative. The record thus plainly indicates that the three statutory requirements for the admissibility of business records were satisfied. Contra *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, supra, 219 Conn. 797. For that reason, we conclude that the court did not abuse its discretion in admitting the SPIN reports into evidence pursuant to the business records exception.

## II

The defendant's second claim is that the court abused its discretion by sustaining various objections by the state. At trial, the court sustained the state's objections to (1) certain documents that were marked for identification as exhibits J, K, L, P and Q,[6] the defendant's attempt to impeach a witness named Elaine Niland through the testimony of Simmons,[7] (3) testimony by the defendant that she was instructed not to cooperate with Lajoie's efforts regarding consolidation, (4) the defendant's testimony that Simmons took her personnel file home and that Lajoie did not attempt to locate Simmons' missing personnel file, and (5) the defendant's testimony that Simmons previously was the subject of an investigation. The state argues that the court's evidentiary rulings were correct, and, in the alternative, that any errors were harmless. We agree with the state's latter contention and conclude that any evidentiary error in the present case was harmless.

It is well established that, "[w]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [Our Supreme Court has] concluded that a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [The court has] considered a number of factors in determining whether a defendant has been harmed by the admission or exclusion of particular evidence. Whether such error is harmless in a particular case depends [on] a number of factors, such as [1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case. . . . Considering these various factors, we have declared that the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Citations omitted; internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 500–501, 964 A.2d 73 (2009).

Our review of the record convinces us that the defendant has failed to meet her burden of demonstrating that any of the court's evidentiary rulings were harmful. Our conclusion is premised on the "weight of the state's evidence absent the contested [exhibits or] testimony . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, 171 Conn. App. 328, 339, 157 A.3d 120, cert. denied, 325 Conn. 911, 158 A.3d 322 (2017). At trial, the state presented overwhelming evidence of the defendant's guilt, most notably her six page confession. See *Arizona* v. *Fulminante*, 499 U.S. 279, 296, 111 S. Ct.

1246, 113 L. Ed. 2d 302 (1991) ("[a] confession is like no other evidence").

Here, the defendant's statement to the detectives was drafted over a period of ninety minutes and was handwritten by Buglione. Buglione testified that the defendant read and signed the confession, and made corrections to the statement. In that statement, the defendant described, in painstaking detail, how she embezzled funds from the American Red Cross. The defendant stated that she began embezzling money after she "figured out" that "there was a button" on the Paychex data entry system that "automatically doubled your paycheck." According to the defendant, starting in 2005, she made approximately $65,000, but she should have earned approximately $53,000 to $55,000 that year. The defendant stated that, in 2006, she "began to really take a lot of money from my payroll" and had paid herself "approximately $110,000" that year, which she acknowledged "was approximately $50,000 more than [she] was entitled to." With respect to 2007, the defendant stated that she was paid approximately $141,000 when her salary "should have been less than $60,000." She also indicated that she "began to add hours and add comp time and cash in vacation time" in 2007. When the defendant ran out of vacation time, she stated, she "began to fictitiously add vacation time that [she] certainly was not entitled to." The defendant further stated that she paid herself "approximately $132,000" in 2008, and $189,000 in 2009. In January, 2010, after learning that "[her] job was going to be eliminated at some point during the year" due to consolidation among local chapters of the American Red Cross, the defendant admitted that she "continued to take the additional money for as long as [she] could" and paid herself approximately $80,000 for only six months of work. In addition, the defendant explained in her statement why she stole from the American Red Cross. The defendant stated that she began having "financial difficulties" in 2005, stemming in part from mortgage obligations and the cost of her daughter's college tuition. "Based on these bills," the defendant stated, she "began inflating [her] pay from the Red Cross." The defendant also indicated that another reason why she stole from her employer was "just impulse on [her] part," stating that she "knew that it was easy to doctor [her] paycheck because [Simmons] never checked." In that statement, the defendant acknowledged that she was "aware of what she was doing but was unable to stop," and that she was "trapped, financially, and needed a way out."

As our Supreme Court has observed: "[A] confession, if sufficiently corroborated, is the most damaging evidence of guilt . . . and in the usual case will constitute the overwhelming evidence necessary to render harmless any errors at trial." (Internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 645, 881 A.2d 1005 (2005); see also *Milton* v. *Wainwright*, 407 U.S. 371,

372–73, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972). In the present case, the defendant's signed confession is sufficiently corroborated. First, the defendant's "intimate knowledge of the details of this crime . . . provide[s] strong corroboration for [her] confession." *State* v. *Shifflett*, 199 Conn. 718, 752, 508 A.2d 748 (1986). The defendant's statement to the detectives was drafted over a period of ninety minutes. See *State* v. *Stevenson*, 269 Conn. 563, 596, 849 A.2d 626 (2004). The defendant's confession also was corroborated by Buglione, who testified that the defendant reviewed and understood the statement before swearing to its accuracy. See *State* v. *Iban C.*, supra, 646. Because the evidentiary rulings in question are not constitutional in nature,[8] the defendant bore the burden of demonstrating harmful error. See *State* v. *Bonner*, supra, 290 Conn. 500–501. In light of the signed confession that properly was admitted into evidence and before the jury, we conclude that the defendant has failed to establish the harmfulness of any of the allegedly improper evidentiary rulings by the court.

### III

The defendant also claims that the court abused its discretion by denying her request for certificates to subpoena several out-of-state witnesses pursuant to General Statutes § 54-82i (c) and by considering the timeliness of her requests. We do not agree.

The following additional facts are relevant to the defendant's claim. On the first day of trial, May 9, 2017, the defendant filed several applications for certificates to summon the attendance of out-of-state witnesses. The applications requested the attendance of Brian Rhoa,[9] Douglas Brownley,[10] Ann Shearer,[11] Frank R. Favilla,[12] and Teala Brewer.[13] That same day, after the jury was selected, both parties had a preliminary discussion with the court about the defendant's application for out-of-state subpoenas. The prosecutor noted that, on the basis of his experience, applications of this nature "take some time." The court then discussed the procedural history of the case and noted that the defendant's first trial had ended in a mistrial on February 9, 2016, approximately fifteen months before the defendant filed the applications at issue.[14] The court asked defense counsel if, during that fifteen month window, she had taken advantage of Practice Book § 40-44,[15] which allows for the depositions of out-of-state witnesses in criminal cases for discovery purposes. Defense counsel conceded that she had not. In response, the court stated that, although it "might be very inclined to grant [the] requests," the defendant needed to have the witnesses in court when the state rested its case. The court at that time stressed that the case was "going to . . . go forward" and that no further delays would be entertained. The court deferred ruling on the defendant's subpoena requests. No further action was taken by the

defendant until May 12, 2017, when, following the conclusion of the second day of evidence, the court heard arguments on why each requested witness was material and necessary. The court thereafter concluded that all five of the out-of-state witnesses were not material or necessary and declined to issue the subpoenas.

A

We first address the defendant's contention that the court improperly denied her request for certificates to subpoena several out-of-state witnesses. Our review of that claim is governed by the abuse of discretion standard. See *State* v. *Bennett*, 324 Conn. 744, 758–59, 155 A.3d 188 (2017).

The defendant's request was filed pursuant to § 54-82i (c), which provides in relevant part: "If a person in any state . . . is a material witness in a prosecution pending in a court of record in this state . . . a judge of such court may issue a certificate under seal of the court, stating such facts and specifying the number of days the witness will be required." "Section 54-82i is Connecticut's adoption of the 1936 revision of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings [Uniform Act]." *Hickey* v. *Commissioner of Correction*, 82 Conn. App. 25, 38, 842 A.2d 606 (2004), appeal dismissed, 274 Conn. 553, 876 A.2d 1195 (2005). "[T]he Uniform Act provides a procedure for summoning a witness in the state of the forum to testify in another state, and a procedure for summoning a witness from another state to testify in proceedings in the forum." 25B Am. Jur. Pleading and Practice Forms, Witnesses § 29 (2020). Pursuant to the provisions of the Uniform Act, an issuing court must make a predicate finding that the proposed witness is a material witness. Id. The defendant argues that each of the witnesses was material and necessary and that the court improperly considered the timeliness of the request in denying the applications.[16]

We have reviewed each of the defendant's written applications and verbal offers of proof to the court on May 12, 2017, as to why the witnesses were material and necessary. On the basis of that review, we conclude that the defendant failed to demonstrate that Rhoa, Brownley, Shearer, Favilla, and Brewer were material and necessary witnesses. In the written applications, the defendant provided generalized allegations that each witness: (1) could testify that "the defendant is an employee of [the American] Red Cross" (which was never in dispute), and (2) "would be able to provide . . . [a]ll notes, documents, memorandums, communications, [and] forensic accounting records of the investigation conducted by the [American Red Cross] regarding the defendant" (which the defendant had already obtained from prior discovery).; At oral argument before this court, the defendant's appellate counsel gave more specific offers of proof for some of the wit-

nesses. For example, appellate counsel referred to defense counsel's proffer that Rhoa "indicate[d] [in the schedule O] that the chapter removed the executive director and [that] finances are monitored by the division vice president in [national's] headquarters." Defense counsel proffered that, because Simmons previously testified that she retired voluntarily, Rhoa's testimony would impeach Simmons' testimony as to that issue. Defense counsel also proffered that Brownley had "been involved with the insurance carrier . . . for coverage regarding this case" and that "there [were] discussion[s] about . . . what was the actual salary . . . ." We agree with the state that the court did not abuse its discretion in finding that each of those arguments pertained to collateral issues, were immaterial to the question of whether the defendant embezzled funds from the American Red Cross, and that much of this proffered testimony would be cumulative because similar issues had already been explored during cross-examination.

Even the proffered testimony of Shearer, who, as the defendant asserted in her offer of proof, was the source of the SPIN information, was insufficient to establish that the court abused its discretion. We agree with the defendant that Shearer's testimony could have been relevant, material and necessary *if* defense counsel had proffered that Shearer's testimony would have challenged the reliability or authenticity of the defendant's SPIN reports that were offered by the state and admitted into evidence. However, the defendant did not make such an offer of proof to the court. Instead, the defendant merely proffered that Shearer could testify as to whether the SPIN information was accurate. In light of the limited nature of the proffer submitted by the defendant, we conclude that the court did not abuse its discretion in denying the defendant's subpoena request.

B

The defendant also argues that the court improperly rested its decision on the time constraints because "[w]hether or not [the] defendant would have had the time to secure the witness is not relevant." To the extent that the court considered timeliness and delay as a factor in determining whether to grant certificates pursuant to § 54-82i, we agree with the state that the court did not abuse its discretion.

As we previously noted, § 54-82i is Connecticut's adoption of the Uniform Act. See *Hickey* v. *Commissioner of Correction*, supra, 82 Conn. App. 38. "Decisions from other states . . . are valuable aids for interpreting the provisions of [the Uniform Act]." Id., 39. In *Commonwealth* v. *Dirring*, 354 Mass. 523, 238 N.E.2d 508 (1968), the Supreme Judicial Court of Massachusetts considered the issue of timeliness in the context of the Uniform Act. In that case, the defendant filed an application on the fifth day of trial requesting the

attendance of thirty-two out-of-state witnesses from various states. Id., 529. The trial court denied the application, in part, because the request was filed at a "late stage" in the proceeding. Id. On appeal, the Massachusetts Supreme Judicial Court held that the denial of the untimely applications was proper, stating: "The defendant would have us read the word 'may' as 'shall'. This we decline to do. Some discretion must reside in the trial judge to prevent abuses. . . . This is particularly so in a case where a defendant tardily presents nothing more than a list of names of persons residing in all parts of the United States, and requests their presence without any prima facie showing that their testimony is relevant or competent." (Citation omitted.) Id., 530. The court continued: "It appears that [the defendant] was arraigned on the indictment on June 10, 1963; the trial commenced on April 6, 1964. Thus [the defendant] had approximately ten months in which to prepare for trial. . . . The denial of the motion reveals no abuse of discretion." Id. Other courts likewise have recognized that one of the requirements under the Uniform Act is that "the petition must be made in a timely manner." *People* v. *Williams*, 114 Mich. App. 186, 201, 318 N.W.2d 671 (1982), appeal denied, 422 Mich. 909, 368 N.W.2d 246 (1985).

We reiterate that the plain language of § 54-82i (c) provides in relevant part that, "[i]f a person in any state . . . is a material witness in a prosecution pending in a court of record in this state . . . a judge of such court *may* issue a certificate under seal of the court, stating such facts and specifying the number of days the witness will be required. . . ." (Emphasis added.) The text of § 54-82i (c) thus confers a degree of discretion in ruling on such applications even when a defendant has demonstrated that a witness is material to the case. See *State* v. *Bennett*, supra, 324 Conn. 758–60 (despite materiality of witness, court did not improperly deny certificate when defendant provided insufficient information regarding address of witness). The defendant here would have us read the discretionary language contained in § 54-82i (c) as requiring trial courts to issue subpoenas even when the applications are filed in the middle of trial. We decline to do so.

As this court has observed, "[t]he trial court has the responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice." (Internal quotation marks omitted.) *State* v. *Stevenson*, 53 Conn. App. 551, 562, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999); id., 563 (affirming denial of continuance to subpoena out-of-state witness when defendant failed to specify probable length of delay and could not assure trial court he would be successful in obtaining witness' attendance). The interpretation of § 54-82i (c) advanced by the defendant would impede those core responsibilities of the trial

court.

In the present case, the court reviewed the trial schedule on May 3, 2017, just prior to the beginning of jury voir dire and nearly one week before the defendant filed her applications with the court. At that time, the court confirmed with counsel its understanding from an earlier chambers conference on April 28, 2017, that, with evidence, deliberation, and additional days, the jury would be advised that the trial will require a commitment of ten days, from May 11 through 24, 2017. When the court asked, "Am I correct with the schedule, counsel?," both counsel for the defendant and the state agreed that they had represented to the court that that should be sufficient time for trial and that the schedule was correct. On May 9, 2017, following jury selection, the defendant filed seven applications for the issuance of certificates for out-of-state witnesses. In its initial review of the applications, the court voiced its concern that the case had been pending more than five and one-half years and that it was "the oldest case in this judicial district." The court also questioned whether the defendant had utilized Practice Book § 40-44 (2), which allows for depositions of out-of-state witnesses in criminal cases for discovery purposes when their "presence cannot be compelled under the provisions of General Statutes § 54-82i . . . ."[17]

Notably, the defendant does not dispute the court's concern that issuance of the certificates would have triggered significant delay, requiring an independent hearing by the courts in each of the respective jurisdictions.[18] At the same time, the defendant concedes that, if she had sought a continuance, the trial court would not have abused its discretion in denying that request. She asserts, instead, that she is seeking only the right to subpoena witnesses. See *State* v. *Godbolt*, 161 Conn. App. 367, 375–79, 127 A.3d 1139 (2015) (court did not abuse its discretion when it declined to grant defendant continuance after considering timeliness, unspecified length of delay and failure to utilize available procedures to secure testimony of out-of-state witness), cert. denied, 320 Conn. 931, 134 A.3d 621 (2016).[19] When, as in the present case, the inevitable effect of issuing a certificate results in delaying the trial for an indeterminate amount of time, that distinction is inconsequential. Nothing in § 54-82i impairs the court's obligation to oversee the management of the trial and the impact that unwarranted and unforeseen delays can have on the availability of jurors, trial dates, and the court's overall docket.[20] In fact, the complicated procedural and logistical consequences arising from the issuance of certificates pursuant to § 54-82i; see footnotes 16 and 18 of this opinion; underscore a defendant's need to make timely as well as adequately supported applications to the court. See *State* v. *Cecil J.*, 99 Conn. App. 274, 292–93, 913 A.2d 505 (2007) (trial court did not abuse its discretion in denying defendant continuance

to meet with witness to review documents on morning of witness' testimony when defendant had months beforehand to interview potential witnesses and to seek judicial orders to permit him to question witnesses who might otherwise be unable to testify), aff'd, 291 Conn. 813, 970 A.2d 710 (2009). Here, the court had confirmed the trial schedule with counsel so that in the course of jury selection, it could advise the venirepersons of the time commitment expected of them. In addition to evaluating the merits of the application, the court also considered that the case had been pending for five and one-half years, and that, since the mistrial fifteen months before, the defendant could have taken numerous steps to secure the testimony of the witnesses.[21] See footnotes 14 and 17 of this opinion. Without a more substantive showing of materiality and necessity, and given the timing and context of the defendant's request, we conclude that the court did not abuse its discretion in denying the applications.[22]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For example, according to the SPIN reports submitted by the defendant, the defendant reported her salary to be $49,536.19 in 2006, $47,205.36 in 2007, $56,356.90 in 2008, $56,659.67 in 2009, and $43,411.71 in 2010. However, Paychex records of the defendant's compensation indicated that the actual compensation that she received was $109,202.27 in 2006, $141,715.42 in 2007, $131,989.89 in 2008, $188,809.47 in 2009, and $78,953.44 in 2010. Simmons and Lajoie testified at trial that the maximum salary a person in the defendant's position was permitted to receive from 2006 to 2010, was $57,000 annually.

[2] After transcribing the defendant's statement, Buglione gave the defendant an opportunity to review the statement and to cross out any spelling errors or make any revisions. For those instances in which the defendant amended the statement, Buglione had the defendant mark her initials next to the cross outs to verify that she was the one making changes to the statement.

[3] General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds twenty thousand dollars . . . ."

Larceny in the first degree is a class B felony. See General Statutes § 53a-122 (c).

[4] The defendant initially filed a self-represented brief claiming that the court improperly denied her motion to suppress the signed statement she gave to the detectives and that the evidence was insufficient to sustain her conviction. On July 8, 2019, the defendant's newly appointed appellate counsel filed a motion with this court for permission to file a substitute brief on the ground that the defendant's self-represented brief inadequately set forth the defendant's claims. This court denied that request but, sua sponte, permitted the defendant to file a late reply brief and/or supplemental brief. The court also permitted the state to file a supplemental appellee brief in the event that the defendant filed a supplemental brief. On October 22, 2019, the defendant filed a supplemental brief raising the issues before us. At oral argument before this court, the defendant's appellate counsel withdrew both pro se claims. Accordingly, we need not consider them.

[5] Alternatively, the state argues that, (1) the defendant's hearsay claim was unreviewable because the defendant's objection at trial pertained to authenticity, not hearsay, and (2) the defendant cannot establish that the admission of the SPIN reports was harmful error due to the admission of the defendant's confession, which explicitly specified how much she stole from her employer. Because we agree with the state that the court properly admitted the defendant's SPIN reports, we need not consider those arguments.

[6] Exhibit J was a spreadsheet showing the fiscal year 2010 budget for the chapter. The court permitted the state to voir dire the defendant, who acknowledged that, although the spreadsheet showed the total salaries paid

out to the entire American Red Cross, it did not show individual salaries. For example, the spreadsheet does not identify how much Simmons was paid. When the voir dire concluded, the state objected to the spreadsheet as irrelevant because "[i]t doesn't go to . . . individual salaries." The court sustained the objection, stating: "It's not relevant to what this jury has to decide . . . ."

Exhibit K was a spreadsheet of the proposed 2010 budget for the chapter, which contained a line item for total salaries for 2009 and total salaries budgeted for 2010. During voir dire, the defendant acknowledged that this spreadsheet included only total salaries, not individual salaries and, thus, would not show the defendant's salary for that year. The state again objected on relevance grounds, and the court sustained the objection, stating: "It's not relevant to what this jury has to decide, the overall gross budget for that chapter."

Exhibit L was a spreadsheet for the 2010 budget for the chapter that was submitted to national. The state objected to the relevance of that spreadsheet because, like exhibits J and K, exhibit L provided only total salaries for the chapter and did not contain individual salaries. The court sustained the objection.

Exhibit P was a consolidated income statement for the twelve month period ending June 30, 2010, that contained a line item for total salaries for the chapter. The state raised a relevance objection, which the court sustained.

Exhibit Q was the June 30, 2010 audit report for the chapter. Like the previous defense exhibits, that document did not contain the defendant's individual salary. The court sustained the state's objection to that audit report.

[7] Niland served on the chapter's board of directors and its finance committee from 1999 until approximately 2005. The defendant called Niland as a witness at trial. She testified on direct examination that, as a member of the finance committee, she maintained a binder of income statements, financial reports, budgets, and any other documents she received from finance committee meetings. According to Niland, she shredded those documents sometime after she was no longer on the finance committee.

Thereafter, the defendant called Simmons as a witness and questioned Simmons about an American Red Cross function in the fall of 2013 (a "Red Cross revisit") that Simmons had attended with Niland. The defendant asked Simmons if Niland had anything in her possession. The state objected to that line of questioning, stating that the defense "seem[ed] to be asking questions with regard to [Simmons] to impeach . . . Niland." The state argued that such questioning was improper and immaterial. The court agreed and sustained the state's objection.

[8] The defendant asserts that the court's decision to sustain various objections by the state was a violation of her constitutional right to a complete defense. The defendant did not preserve that claim at trial and now requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Because her claims are evidentiary, and not constitutional, in nature, that request is unavailing. See *State* v. *Golding*, supra, 240–41 ("Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label. . . . For example, once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." (Citations omitted.)).

[9] The defendant first challenges the denial of her request to subpoena Rhoa, the chief financial officer for the American Red Cross, who resided in Washington, D.C. According to the application filed by the defendant, Rhoa signed an Internal Revenue Service form 990 for the 2011–2012 tax year on February 13, 2014. In an accompanying schedule O supplemental information form, Rhoa described the circumstances surrounding the defendant's embezzlement. The defendant alleged initially that the Rhoa's testimony was material and necessary to establish that the defendant was an employee of the American Red Cross. At trial, defense counsel elaborated that the reason Rhoa's testimony was material and necessary was because he "indicate[d] [in the schedule O] that the chapter removed the executive director and finances are monitored by the division vice president in [national's] headquarters." Thus, because Simmons previously testified that she retired after twenty-nine years, the defendant wanted to offer Rhoa's testimony to establish that Simmons' employment was terminated by the Red Cross and that she did not leave voluntarily. The court denied the request to subpoena Rhoa, finding that the defendant did not meet her burden of

showing that the statement was material and necessary. However, the court advised the defendant that its ruling did not preclude her from filing a motion to admit the Internal Revenue Service statement as a business record.

[10] The defendant next claims that the court improperly denied her request to subpoena Brownley, a corporate claim manager in risk management at the American Red Cross. Brownley also resided in Washington, D.C. In her application, the defendant stated that Brownley was a material and necessary witness "because he was . . . the claims manager assigned to the defendant's matter" who could testify as to "[t]he insurance policy in effect at the time of the incident in the information," "[t]he deductible on the [American Red Cross'] insurance policy," "[a]ll amounts paid to the [American Red Cross] by insurance," "[a]ll documents submitted or received by the [American Red Cross] regarding this claim," and "[t]he content of e-mail[s] sent and received in the ordinary course of business by this witness . . . ."

At trial, the court questioned defense counsel concerning the relevance of such testimony:

"The Court: How is that relevant to what this jury has to decide? Whether there's any insurance coverage or not is not relevant, to my understanding. I mean, it might be relevant in terms of, if, per chance, this jury made a guilty finding, as far as a potential disposition with whether a policy paid X amount . . . for restitution purposes. But that's not relevant for a jury to hear unless there's something else you want to add.

"[Defense Counsel]: There is. . . . I understand what the court is saying and anticipated that. But my point was that, in conversations between [Brownley] and the insurance carrier . . . there was discussion about . . . what was the actual loss, does anybody know her salary, can we find her salary, where is it. And, so, it was the same kind of discussion that's already come into evidence in this case a little bit. And . . .

"The Court: . . . You have challenged appropriately in your cross-examination the salary . . . and the jury is going to make a decision on that. So, I don't know what Brownley would add to that discussion . . . that's any different as far as the salary of [the defendant]. I mean, in other words, that that's [not] material and necessary for somebody who resides in [Washington, D.C.] unless there's something else on there that I'm not.

"[Defense Counsel]: No. It would—it would focus on that.

"The Court: I'm going to deny the request for that individual."

[11] The defendant's third subpoena request was for Shearer, vice president of Human Resource Enterprise Services at the American Red Cross. Shearer also resided in Washington, D.C. The defendant claimed that Shearer was a material and necessary witness because she was "Chief Investigator Frank Favilla's superior, who was an integral part of the [American Red Cross'] investigation into the actions" of the defendant. The defendant thus argued that Shearer could testify "[t]hat the [d]efendant was an employee of [the] Red Cross," and that Shearer could provide "[a]ll notes, documents, memorandums, communications, forensic accounting records of the investigation conducted by the [American Red Cross] regarding the defendant, including, but not limited to, all communications with . . . Favilla," and "[t]he content of e-mails sent and received in the ordinary course of the business by [Shearer] . . . ."

From the outset, the court was skeptical of the necessity of Shearer's testimony and the document requests:

"The Court: "You know, my understanding, and based on my involvement in this trial so far, is that [the state] . . . basically, has an open file policy. My understanding is, they've given you all the documents relevant that you've requested. . . . So, is some of this duplicates of what has already been done here?"

Defense counsel then made the following offer of proof as to why she believed Shearer's testimony and the document requests were material and necessary:

"[Defense Counsel]: [M]y understanding from e-mails that I obtained from . . . Favilla last year is that [Shearer] was the source of the SPIN information. She was the one that was responsible for sending it to Rebecca C. Williams, who was an assistant for [Favilla], who then sent it to [Lajoie]. So, [Shearer] would be, my understanding, the source of the SPIN information and be able to say how it was—if that is, in fact, the SPIN information.

"The Court: But, as a practical matter, how—if I agreed with your position that this is material and necessary information for this jury to hear, how are you going to have [Shearer] in a few days—

"[Defense Counsel]: I know.

"The Court: —based on the protection that the statute affords a potential

witness? I mean, you know, you tell me. I mean, the statute—

"[Defense Counsel]: I mean, she may—she may agree to come. I mean—

"The Court: I have . . . no problem with that.

"[Defense Counsel]: Right.

"The Court: No problem with that. I mean, you could call her as soon as we adjourn today. I mean, there's no prohibition on that . . . . And, you know, maybe all these people will agree to come. But you're asking me, pursuant to statute, to make a finding that their proposed testimony is material and necessary . . . . I think we're all in agreement with what that entails, going to a circuit court or a superior court down in—most of these are in [Washington, D.C.], some of these are in Virginia, where, you know, a notice is sent, summons is sent for somebody to come a few weeks down the road. Then, that judge has to make an independent finding. You know, we've [reviewed] the dates of this case before. This case is not going to be delayed, and I think you'll agree with that. So, you know, there's nothing wrong with you contacting her in ten minutes; maybe she'll come on up. So, I'm going to—what you've presented to me—I make a finding there's nothing material and necessary that is needed for this particular client."

[12] The fourth application at issue was the request to subpoena Favilla, an investigation officer at the American Red Cross who resided in New York. The defendant argued that Favilla was a material and necessary witness because "he [was] an investigator of the alleged larceny of which the defendant is accused" who could testify that "the defendant was an employee of [the] Red Cross," and the defendant also sought "[a]ll notes, documents, memorandums, communications, forensic accounting records of the investigation conducted by the [American Red Cross] regarding the defendant," "[i]nformation contained in a binder referenced in [an] e-mail dated Tuesday, August 16, 2011, at 2:07 p.m.," and "[a]ll e-mails sent and received by this witness in the course of his duties . . . ." The court disagreed that any of the testimony or records sought were material and necessary, and denied the subpoena request.

[13] The defendant's final subpoena request sought to secure the attendance of Brewer, vice president of the Office of Investigations, Compliance and Ethics at the American Red Cross, who resided in Washington, D.C. The defendant claimed that Brewer was a material and necessary witness because she was Favilla's "superior who was an integral part of the [American Red Cross'] investigation into the actions of [the defendant]." The defendant further argued that Brewer could testify "[t]hat the defendant was an employee of [the] Red Cross" and that she could provide "[a]ll notes, documents, memorandums, communications, forensic accounting records of the investigation conducted by the [American Red Cross] regarding the defendant, including, but not limited to, all communications with [Favilla]," "Frank Aiello, senior director, Information Security," and "Rebecca C. Williams, senior director Office of Investigations, Compliance and Ethics . . . ." Finally, the defendant claimed that Brewer could testify as to "[t]he content[s] of e-mail[s] [that Brewer] sent and received in the ordinary course of the business . . . ."

At trial, the court asked defense counsel why obtaining e-mails from Brewer was necessary, and the following colloquy transpired:

"The Court: Now, on these e-mails, you have these e-mails on [Brewer], right, a lot of them? . . .

"[Defense Counsel]: Yeah."

Accordingly, the court denied the application for Brewer's testimony.

[14] The defendant's first trial ended in a mistrial because new information in the form of undisclosed e-mails between American Red Cross employees required a delay in the proceedings. The court made specific findings on the record that the mistrial was through no fault of the state or the defendant.

[15] Practice Book § 40-44 provides: "In any case involving an offense for which the punishment may be imprisonment for more than one year the judicial authority, upon request of any party, may issue a subpoena for the appearance of any person at a designated time and place to give his or her deposition if such person's testimony may be required at trial and it appears to the judicial authority that such person:

"(1) Will, because of physical or mental illness or infirmity, be unable to be present to testify at any trial or hearing; or

"(2) Resides outside of this state, and his or her presence cannot be compelled under the provisions of General Statutes § 54-82i; or

"(3) Will otherwise be unable to be present to testify at any trial or hearing; or

"(4) Is an expert who has examined a defendant pursuant to Sections 40-

17 through 40-19 and has failed to file a written report as provided by such sections."

[16] A plain reading of the text of § 54-82i (c) indicates that the court must find only that an out-of-state witness is a material witness in order to trigger the processes pursuant to its provisions; it does not require a showing that the witness is necessary. In reliance upon such representations by the defendant, the court may "issue a certificate under seal of the court, stating such facts and specifying the number of days the witness will be required." General Statutes § 54-82i (c). By contrast, the court of the sending state, as a signatory to the Uniform Act, must determine whether a person who is the subject of the certificate is a material *and* necessary witness, relying, in part, on the representations in the certificate of the issuing court as "prima facie evidence . . . ." D.C. Code § 23-1502 (b) (2001). To illustrate, § 54-82i (b), which applies when this state is the sending state under the Uniform Act and is nearly identical to the provisions of the Uniform Act in the jurisdictions that have adopted it, provides in relevant part that "such judge shall fix a time and place for a hearing and shall make an order directing the witness to appear at such time and place for such hearing. If, at such hearing, the judge determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution . . . the judge shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court where the prosecution is pending . . . at a time and place specified in the summons. At any such hearing, the certificate shall be prima facie evidence of all the facts stated therein. . . ." General Statutes § 54-82i (b).

In the present case, the defendant has maintained in her applications, in her argument to the court and on appeal to this court that the legal standard is materiality and necessity. This appears to be a fair interpretation of the burden the defendant must ultimately demonstrate because the certificate on which the sending court relies for prima facie evidence in support of its ultimate conclusions is generated by the issuing court. Indeed, the record reflects that, in arguing that each of the proposed witnesses was material and necessary, the defendant submitted applications that specifically cited to this state's provisions of the Uniform Act and the provisions of the respective sending jurisdictions. In addition, the defendant drafted the certificates with a representation that each respective witness was a material and necessary witness in the proceeding to which the court, upon approval, would have to attest under seal of the court.

Therefore, although the trial court, in order to trigger the procedures pursuant to § 54-82i (c), is required to determine only that a witness is material, and then represent the factual basis for its finding in the issuing certificate conveyed to the sending state, we agree with the defendant that consideration of whether a witness is necessary comes within the ambit of the court's discretion. Because a successful application will ultimately require the court of the sending state to make a finding, inter alia, of necessity as well as materiality, the issuing court's independent inquiry as to whether the witness is necessary is not unreasonable or inappropriate in order to assure itself that (1) the process is not a futile exercise, and (2) any facts supporting the necessity of a given witness be included in the certificate for review by the sending state. Cf. *Davenport* v. *State*, 289 Ga. 399, 406–407, 711 S.E.2d 699 (2011) (Hines, J., dissenting) (In challenging the majority opinion's holding that the issuing court is limited to a finding of materiality, the dissent observed that, "even assuming arguendo that a showing of 'necessity and materiality' is different and a greater burden than that of solely 'materiality,' it defies logic and flies in the face of judicial economy that the [legislature] intended that the threshold showing . . . be lesser than that before the court in the foreign jurisdiction. To find otherwise permits a petitioner to utilize the judicial time and resources of two jurisdictions when the petitioner cannot initially prevail, and allows 'necessity' to be decided solely by a court other than the one faced with the trial of the case.").

[17] The court's inquiry was particularly apt because, as the defendant acknowledged, fifteen months had elapsed since the mistrial in the case due to numerous late disclosed documents and e-mails by the American Red Cross. See footnote 14 of this opinion. Under such circumstances, the usual purpose of a mistrial and continuance is to mitigate the prejudice to the defendant and to allow her the opportunity to prepare for trial, including engaging in additional discovery as necessary. The court's query thus follows naturally from the defendant's applications, which, in our view, are more akin to discovery requests than representations of how each witness is

material and necessary to the defense.

[18] The court observed that such hearings require notice and summons for a hearing to be scheduled potentially weeks later, and it also referenced the statutory protections afforded to potential witnesses. Specifically, the provisions of § 54-82i (b) require that the sending court determine that the witness is material and necessary, and also that it will not cause undue hardship to the witness to be compelled to attend and to testify.

[19] See also *State* v. *Rivera*, 268 Conn. 351, 379, 844 A.2d 191 (2004) ("[a]lthough resistant to precise cataloguing, such factors revolve around the circumstances before the trial court at the time it rendered its decision, including: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the defendant's personal responsibility for the timing of the request" (internal quotation marks omitted)); *State* v. *Bethea*, 167 Conn. 80, 86, 355 A.2d 6 (1974) (trial court did not abuse its discretion in denial of motion for continuance when defendant made no showing of good faith and diligence in attempting to find alibi witnesses during five months between his arrest and trial).

[20] See *State* v. *Godbolt*, supra, 161 Conn. App. 376 ("The trial court has the responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice. . . . Once a trial has begun . . . a defendant's right to due process . . . [does not entitle] him to a continuance upon demand." (Internal quotation marks omitted.)).

[21] On May 12, 2017, the court stated that, since the mistrial, counsel could have "contacted [the witness] at any time . . . sent [her] investigator . . . [taken] a deposition . . . or [she] could . . . contact him [that] afternoon." Although the court would not delay the trial, the court also repeatedly stated that the defendant was free to contact the witnesses to determine their willingness and availability to testify. See footnote 11 of this opinion.

[22] The defendant also claims that the court violated her constitutional right to present a defense under the sixth amendment to the United States constitution by denying her applications to subpoena out-of-state witnesses. Having failed to preserve that constitutional claim at trial, the defendant requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40, as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

Aside from a cursory reference to *Golding*, the defendant has failed to engage in an analysis of the four prongs of *Golding*. Because we conclude that this claim is inadequately briefed, we consider it abandoned. See, e.g., *State* v. *Tierinni*, 144 Conn. App. 232, 238, 71 A.3d 675 ("It is well established that . . . this court will not review claims that were not properly preserved in the trial court. . . . [A] defendant's failure to address the four prongs of *Golding* amounts to an inadequate briefing of the issue and results in the unpreserved claim being abandoned." (Internal quotation marks omitted.)), cert. denied, 310 Conn. 911, 76 A.3d 627 (2013).